———— COLLOQUY ————

1      Number two, I think the only party that gets hurt here
2  is defendants if this charge is not given. And here's why.
3  If plaintiff's counsel said to me before Dr. Lowe's video
4  deposition, I'm canceling him, I'm not going to call him, I'm
5  going to rely upon Skolnick, I think they're cumulative,
6  that's one thing. He didn't. He wants this jury to be able
7  to hear Dr. Lowe say everything except that which we all know
8  he couldn't say.
9          THE COURT: I don't know that.
10         MR. SEGAL: Well, I think it's clear that he said --
11         THE COURT: I can infer that. You can argue that.
12  But I don't know what Dr. Lowe did or didn't say either to
13  plaintiff or to her lawyer about what he was willing to
14  testify or not. All I know is that he was withdrawn as an
15  expert. I don't know that -- I can surmise, I suppose, but I
16  don't know to any certainty that that's the basis for that
17  change.
18         MR. SEGAL: I'll respond this way. Plaintiff's
19  counsel made the argument about Skolnick and asked you to take
20  certain language and extrapolate out it and included it. I
21  clearly think when Dr. Lowe, at the very end of his testimony,
22  went on for moments listing every single thing he reviewed,
23  including his own surgical findings, and then included all the
24  things that he never even had known about and said, I can't
25  tell you how long the condition, I did surgery for, existed.

*United States District Court*
*Trenton, New Jersey*

-828a-

———COLLOQUY———

1  The next extrapolation is -- and I tried to ask the question

2  but we objected and I withdrew, was that, You then could not

3  say that the surgery you did was warranted.  Now, I was not

4  allowed to ask that question, because the argument was made,

5  and I think that was fair, that he was not an expert, he did

6  not give that testimony.  But, again, I think it's unfair to

7  the defendants to allow him at the last moment to give

8  everything and then not give -- then, on the other hand, we in

9  defendant's opinion expand Skolnick to now subsume it when it

10 is clear in the joint pretrial order --

11       THE COURT:  Well, I know you disagree with that but

12 the Court has already determined that the scope of Dr.

13 Skolnick's report is adequate to allow him to testify in that

14 regard.

15       MR. SEGAL:  Yes.  But my point is not to question

16 your Honor's ruling but to question what is being represented

17 to the Court as the reason things were done.  The joint

18 pretrial order is clear, there was no -- why wasn't it known

19 at that point that they were going to be cumulative.  They

20 were clearly there for different reasons.

21       THE COURT:  Don't you -- wouldn't you acknowledge

22 that in a classical setting, the use of the adverse inference

23 charge relates to an absent or absence of a witness, not the

24 absence of testimony from a witness.

25       MR. SEGAL:  That's a distinction that I would answer

*United States District Court*
*Trenton, New Jersey*

COLLOQUY

1   this way, it is absent of an expert.  The mere fact that he

2   was called as a treating which Mr. Smith makes a huge

3   distinction about.  So, in my answer to you is, there is an

4   absence, there is an absence of neurosurgical expert that was

5   designated up to one week before trial in the joint pretrial

6   order.  I'm not even sure, your Honor, by my own memory -- no,

7   I do know.  I believe the joint pretrial order was submitted

8   after the deposition was done and he was still designated as

9   an expert.

10          THE COURT:  When was the deposition done?

11          MR. SEGAL:  The 8th of August.  I believe the

12   pretrial report was only a week or so before the actual trial.

13          THE COURT:  Filed on August 14th.

14          MR. SEGAL:  So, if that truly was the reason why he

15   was withdrawn as an expert, than why was he not nodded off the

16   pretrial order in the expert section?  We clearly told him at

17   the deposition that we would seek the adverse inference

18   charge, we put him on notice because we wanted to be fair to

19   plaintiff that he was giving us, at least before the dep

20   started, notice of the change.  And I believe we even put it

21   on the record before we started the deposition.  So, I think

22   that clearly this is, I'll give him credit, a clever argument

23   to now be made.  I also think the cases cite to superior

24   testimony.  Clearly, the person who did the surgery itself

25   would have been the best person available to give testimony on

COLLOQUY

 1  its causal relationship.  And, again, I don't think it was a

 2  strategic reason or cumulative to choose an orthopedic surgeon

 3  to give an opinion over that which the neuro -- the operating

 4  neurosurgeon had originally said he would do.

 5          THE COURT:  Mr. Smith.

 6          MR. SMITH:  Judge, the last comment by Mr. Segal I'll

 7  respond to first, the treating physician is often times the

 8  worst person to call for an opinion because they are not

 9  interested in so much of the things that perhaps forensic

10  experts are in the opinions of causal relationship.  They find

11  out what's wrong, they take a history, and they are more

12  interested in providing medical treatment.

13          THE COURT:  Well, that may be true in a more general

14  context, but that's not what happened here.

15          MR. SMITH:  It is what happened here.  Now, I don't

16  think I need to divulge what my strategies were, my trial

17  strategies at all.  They certainly -- Dr. Skolnick was

18  certainly going to testify, according to the report, and

19  counsel had that report.  And I wasn't going to change it.

20  Whether or not -- first of all, distinction isn't as clear as

21  counsel tries to make it be.  Your Honor heard that videotape.

22  Counsel's cross-examination was virtually as if he was

23  testifying as an expert.  Although, I objected, and your Honor

24  ruled on those objections, he clearly got, as if the doctor

25  was given an opinion.  With the exception of, and I grant

—————————————————— COLLOQUY ——————————————————

1  counsel that the last question that we had as to the last

2  dialog or argument we had before we played the videotape, but

3  the doctor testified -- he testified mainly for what he was

4  there for, what he found, what he did.  And he went through an

5  extensive cross-examination.  It's not an absent witness.

6      As I cited to the Court, these cases clearly, clearly

7  would be prejudicial to the plaintiff to get an inference that

8  just because he didn't give an opinion, they can make that

9  argument, very strongly, I'm sure.  That he didn't give me the

10 opinion.  But to get an inference from the Court would be just

11 probably fatally prejudicial to the plaintiff's case.

12     THE COURT:  Let me ask you this, although, I had not

13 made a determination, but in the event I were to allow the

14 charge, do you have an objection to the language in the charge

15 as proposed?

16     MR. SMITH:  Now, I have to look at it, Judge.

17     THE COURT:  Take a moment.

18     MR. SEGAL:  Your Honor, while he's looking, can I

19 make one point, only because your Honor raised questioning

20 about being absent.  The charge that we proposed, we got from

21 the *Clawans* case that we cited --

22     THE COURT:  Also, the model charge.

23     MR. SEGAL:  Right.  And the reason I only raise that

24 is because it says, The failure of a party to produce before

25 the jury testimony.  It doesn't say a person.  Clearly, we

COLLOQUY

1   know that rules and model jury charges are written in certain

2   ways, and that's why I drew the distinction to your Honor

3   before, if you're going to say an expert gives different

4   testimony than a treating doctor, that's why it was written

5   that way.  You don't get to pick and choose at the last second

6   what you want to do when the playing field has been laid out,

7   especially here where we had a pretrial order.  And, again,

8   done after the fact.  The language if that's an issue, we can

9   certainly try and work on that.  I don't know if Mr. Smith, if

10  he has an answer on that.

11         MR. SMITH:  I don't like to give an answer on that,

12  Judge, because it subsumes your Honor is going to rule against

13  me.

14         THE COURT:  Well, I told you not to.  I don't know.

15  To be perfectly candid, I want to take another look at it, and

16  I want to read the cases that are cited and the comments to

17  the model, but I -- when we decide, obviously, if it goes, it

18  goes.  If it stays, I don't want to be negotiating language

19  tomorrow morning.

20         MR. SMITH:  My immediate response to that, then,

21  Judge, would be, I don't -- this is not a case where -- the

22  second to last sentence, The failure of a party to produce

23  before the jury, the jury testimony which appears would serve

24  to clarify certain facts in issue, raises a natural inference

25  the party failing to produce testimony fears it would expose

————COLLOQUY————

1  facts... It does not -- they're not facts at all testified

2  to, it was his opinion was the only thing that was left out of

3  his testimony. I think this confuses the jury.

4  THE COURT: I understand the confusion argument

5  generally about the charge. But you're saying this sentence

6  is particularly problematic. The sentence in the model reads,

7  The failure of a party to produce -- I would take out the

8  fourth jury, just because it's awkward -- to produce testimony

9  which appears would serve to clarify certain facts in issue,

10 it raises a natural inference that the party fails to produce

11 testimony appears it would expose facts unfavorable to her.

12 And because it's an expert, you're saying it's an opinion that

13 would be unfavorable to her.

14 MR. SMITH: The issue that the doctor didn't address

15 is proximate cause. It's essentially the jury's function

16 anyway. So, I mean, for them -- the last sentence is equally,

17 as I think, not appropriate in this case. His testimony would

18 have been unfavorable to Ms. Mahmood. Well, he gave three

19 hours of testimony. I don't --

20 MR. SEGAL: You can't argue over -- that's getting

21 back to whether the adverse inference charge is valid. If

22 it's valid the wording -- the ultimate wording of the adverse

23 inference charge is that, that which you didn't hear is deemed

24 unfavorable to the party you chose not to produce.

25 THE COURT: Well, Mr. Smith's point is that, it leads

COLLOQUY

1 -- it may lead to some confusion with the jury as to the

2 testimony which he did offer.

3      MR. SEGAL:  I certainly have no problem if a line is

4 added that, obviously, you as the jury, per my previous

5 instructions get to weigh the testimony you heard from Dr.

6 Lowe --

7      THE COURT:  Well, could it be, again, I have not made

8 a determination and you should infer nothing from this

9 conversation.

10      MR. SEGAL:  I understand.

11      THE COURT:  But would it address the concern that has

12 been raised to modify at least the last sentence so we can

13 deal the one before in the moment.  As such, you can infer

14 from the failure of Dr. Lowe to be called as an expert that

15 his expert opinions would have been unfavorable to Ms.

16 Mahmood.  It leaves aside -- because you told me his testimony

17 was what it was, but he stopped short of giving the opinions

18 which you expected he was going to give based on his report.

19 Probably wouldn't have changed the testimony that he gave.  It

20 would have been consistent with what he said on the video.

21 The only thing missing is his expert opinion, right?

22      MR. SEGAL:  I agree.  In essence, the last question

23 that we fought over.  So, I have to see the wording that you

24 just said only because I'm slow and it's easier for me to read

25 it than hear it, but I certainly have no reason if ultimately

─────────COLLOQUY─────────

1   there is an explanation or something --

2          THE COURT:  Well, we don't need to spend any more

3   time on this.  I'll make a determination with respect to this

4   issue.  I'll modify the charge accordingly.  I'll reproduce

5   another version.  And if it's in, we'll comment on the

6   language that I suggested.  If it's out, it's out.  Okay.

7          Now, with respect to the documents that -- or exhibits

8   that defendant wants to move to which the plaintiff objects:

9   The answers to interrogatories.  These are the answers to

10  interrogatories that were --

11         MR. SEGAL:  The 2006 accident.

12         THE COURT:  -- produced in connection with the

13  litigation involving the 2006 accident.

14         MR. SEGAL:  That is correct, your Honor.

15         THE COURT:  These are her certified answers to

16  interrogatories.  Not talking about the --

17         MR. SEGAL:  11.

18         THE COURT:  The lawyer 11.

19         MR. SEGAL:  Not talking about any amendments.  This

20  is just the Form A Supplemental Rogs with the questions and

21  answers and her certification page.

22         THE COURT:  Mr. Smith, what's the objection to

23  admitting in evidence plaintiff's certified answers to

24  interrogatories?

25         MR. SMITH:  Judge, two-fold.  Relevance.  And even if

COLLOQUY

1  it is arguably relevant, it is unduly prejudicial.  Because

2  the jury would now be cognizant, have in front of them, the

3  fact that she had prior litigation for that motor vehicle

4  accident.  That's entirely inappropriate.

5       THE COURT:  Isn't all evidence designed to be

6  prejudicial on some level?

7       MR. SMITH:  Well, some is worse than others.

8       MR. SEGAL:  Your Honor, on relevance, I don't know

9  how it can be irrelevant specifically it identifies and

10  itemizes injuries.  That, again, goes to credibility because,

11  for instance, she doesn't say back.  Yet, in all her medical

12  records she complains of back.  She complains of neck.  So, it

13  certainly goes to (a) credibility.  Definitely goes to the

14  relevancy of the records.  And then with respect to the

15  litigation, I'm not sure that the mere fact that someone -- I

16  can understand the argument that you don't bring up insurance

17  because it's prejudicial, but I've never come across any case

18  that said you couldn't -- that somehow someone knowing she was

19  involved in prior litigation would be prejudicial.  We never

20  tried to argue that she did or didn't get money, the outcome

21  of it, I've never done anything but to try and submit evidence

22  that goes clearly to her credibility which has been relevant

23  from the moment we started this case.

24       MR. SMITH:  Judge, I can be happy to produce probably

25  four or five cases that say that that is inappropriate and

*United States District Court*
*Trenton, New Jersey*

─────── COLLOQUY ───────

1  irrelevant to bring up prior litigation for prior injuries.

2  And those documents are part of that litigation process.

3  They're is a claim number.  There is a docket number.  There

4  is a defendant identified.  This jury is going to infer that

5  she was already compensated.

6       MR. SEGAL:  Your Honor, I agree to all that being

7  redacted.  They're sworn to by her.  Isn't it a statement

8  against interest or her own statement --

9       THE COURT:  Let's take what you just said.  If we

10  simply address -- the only thing that you purport to be

11  interested in here is -- and, frankly, I have forgotten the

12  form question, but I know the question it says, essentially,

13  tell me what injuries you contend were caused as a result of

14  this accident?

15       MR. SEGAL:  And the fact that it notes the 2006

16  accident in another question just so they know what it relates

17  to, correct.

18       THE COURT:  If we remove the caption, and we remove

19  the reference to the litigation, whatever might be in there,

20  and you simply had the one or two questions that were there

21  together with her certification --

22       MR. SEGAL:  If I can approach, there is no caption.

23  It just says, answers to form interrogatories on behalf of

24  plaintiff Sania Mahmood.  If you want to take off the cover

25  page --

─────────────COLLOQUY──────────────

```
 1          THE COURT:  Everybody does these differently.

 2          MR. SEGAL:  No, but if you want to take off the cover

 3   page from the attorney serving it which references litigation,

 4   I certainly have no objection to the lawyer's letter not being

 5   part of that exhibit, that the exhibit be modified not to

 6   include that page.

 7          MR. SMITH:  There is reference to an insurance

 8   company.

 9          MR. SEGAL:  The defendants will agree we redacted

10   that, I believe.

11          MR. SMITH:  You already redacted it.

12          THE COURT:  Talking about 23.

13          MR. SEGAL:  I think it's redacted.

14          THE COURT:  Already redacted on this copy.

15          MR. SMITH:  I'm just looking at copy of D-1.

16          MR. SEGAL:  We redacted it.

17          THE COURT:  Which particular questions are you

18   interested in?

19          MR. SEGAL:  Well, I think two, three.  I think there

20   is another one that lists all the doctors toward the bottom of

21   the page.  I think there are questions in there about prior

22   accidents wherein that area she admits the 2002, but clearly

23   we have shown at other times she doesn't.  So, she's been very

24   selective.

25          THE COURT:  I would imagine you don't want the
```

*United States District Court*
*Trenton, New Jersey*

──────── COLLOQUY ────────

1  information in here about her work lost wage claim from the

2  prior accident, do you?

3       MR. SEGAL:  I don't care.  If plaintiff's counsel

4  wants it redacted, I certainly have no objection to it.  It

5  was not under questioning on that issue, and I am not

6  submitting it for any proof and --

7       THE COURT:  It would seem to me that all the

8  information that you are looking to provide is contained on

9  page -- the first page of answer to Form a.

10      MR. SEGAL:  Isn't there a mention of the 2002

11  accident somewhere else.

12      THE COURT:  Bottom of the page.

13      MR. SEGAL:  Oh, okay.  I thought it was later in the

14  supplementals, that's fine.  If that page goes with her

15  certification, so they can remember that she --

16      THE COURT:  What's the other exhibit?

17      MR. SEGAL:  The other exhibit we were looking to just

18  to admit those lines of her -- from her deposition transcript

19  that we specifically identified to her with any other

20  information around it redacted.

21      THE COURT:  During the trial here.

22      MR. SEGAL:  That we use for cross-examination.

23      THE COURT:  What's wrong with that, Mr. Smith?  With

24  that transcript, the particular elements that were read and

25  she testified about.

———COLLOQUY———

1      MR. SMITH:  Because they already read them.  It's a
2  hearsay document.
3          THE COURT:  It's sworn testimony.
4          MR. SEGAL:  It's her --
5          MR. SMITH:  Why don't we put the whole transcript in?
6  And we can put every witness's transcript in?  That's not the
7  way it works.
8          THE COURT:  This is an element of the trial that she
9  was inquired about, if not confronted by, and testified to.
10  Why isn't that admissible?
11         MR. SMITH:  Because it's inappropriate to take a
12  statement in a proceeding outside of court and put it in front
13  of the jury.  Certainly, they cross-examined her on it, I
14  couldn't object to that.  But to put the document in front of
15  them is inappropriate.
16         MR. SEGAL:  Judge, one of the instructions we give is
17  this is full force as if you were standing in a courtroom.
18  And you have to understand that.  And it's her own statement
19  so it can't be hearsay.  And it was sworn testimony.  So, in
20  essence, it's a sworn prior statement by this same witness
21  which was used to contradict and goes to credibility.  But I
22  don't wish to put the whole thing in.  I didn't wish to try to
23  do that during trial.  If plaintiff's counsel wanted to do it,
24  he should addressed those issues.
25         MR. SMITH:  How can I get her transcript in evidence?

*United States District Court*
*Trenton, New Jersey*

COLLOQUY

1      MR. SEGAL:  No. No.  What I meant is, if he wanted
2  to take other portions and say that she was truthful, say, on
3  page six and then seek to move that in, that would have been
4  his job, not mine.

5      MR. SMITH:  That would have been objected to.

6      THE COURT:  Bring those exhibits with you in the
7  morning, I'll deal with those three issues quickly then, the
8  two objections to the exhibits and the adverse inference
9  charge, okay.

10      MR. SMITH:  Thank you, Judge.

11      THE COURT:  Why don't we -- the jury will get here at
12  nine, I know you're going to be ready with your closings, but
13  if you all could be here a few minutes before nine just to
14  deal with the couple housekeeping issues then we'll step right
15  off as soon as everybody is here.

16      MR. SMITH:  Fine, Judge.

17      MR. SEGAL:  Thank you.

18      THE COURT:  See you then.

19      (The proceedings are adjourned for the day.)

20

21        *         *         *         *         *

22

23

24

25

*United States District Court*
*Trenton, New Jersey*

1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
2

3    _____

4    SANIA MAHMOOD,

             Plaintiff,           CIVIL ACTION NUMBER:
5

             -vs-                 3:09-cv-02656
6
     JOSEPH NARCISO, JR., MAYFLOWER
7    TRANSIT, LLC, ABC CORPORATION
     (1-100) (said names being
8    fictitious) VANTAGE BLUE, XYZ
     CORPORATION (1-100) (said names
9    being fictitious), AND JOHN DOES
     (1-100) (said names being
10   fictitious),

11           Defendants.
     _____
12        Clarkson S. Fisher United States Courthouse
          402 East State Street
13        Trenton, New Jersey 08608
          August 24, 2012
14
     B E F O R E:      HONORABLE DOUGLAS E. ARPERT
15                     UNITED STATES MAGISTRATE JUDGE

16
     A P P E A R A N C E S:
17
     PELLETTIERI, RABSTEIN & ALTMAN, ESQUIRES
18   BY:  THOMAS R. SMITH, ESQUIRE
     Attorneys for the Plaintiff.
19
     WEBER, GALLAGHER, SIMPSON, STAPLETON, FIRES & NEWBY, ESQUIRES
20   BY:   JEFFREY A. SEGAL , ESQUIRE
                and
21        NANCY MONTE CARLO, ESQUIRE
     Attorneys for the Defendants.
22

23
     Certified as True and Correct as required by Title 28, U.S.C.,
24   Section 753
           /S/ Cathy J. Ford, CCR, CRR, RPR
25

I N D E X

|  |  | PAGE |
|---|---|---|
| CLOSING ARGUMENT | | |
|   –   MR. SEGAL | | 8 |
|   –   MR. SMITH | | 15 |
| JURY INSTRUCTIONS | –    COURT | 28 |
| VERDICT | – | 43 |

E X H I B I T S

| NUMBER | DESCRIPTION | EVID. |
|---|---|---|
| PT-1 | Hamilton records dated 6/19/07 | 8 |
| PT-2 | Hamilton records dated 12/5/07 | 8 |
| PT-3 | Accident report | 8 |
| PT-4 | Garden State MRI dated 8/6/08 | 8 |
| PT-5 | Dr. Lowe's report dated 6-24-09 | 8 |
| PT-6 | Pain management records dated 11/24/08 | 8 |
| PT-7 | Initial Evaluation Physical Therapy | 8 |
| PT-8 | Princeton Orthopedics Group 12/10/08 | 8 |
| PT-9 | Quakerbridge Radiology dated 10-15-08 | 8 |
| PT-10 | Saint James Hospital record dated 6/12/07 | 8 |
| PT-11 | Virtua Medical records dated 2/2/09 | 8 |
| PT-12 | Psychiatric progress notes dated 8/26/09 | 8 |
| PT-13 | Professional Pain management records 2/12/10 | 8 |
| PT-14 | Dr. Lucasti's records dated 3/10/09 | 8 |
| D-1 | Mahmood's Answers to Interrogatories | 8 |
| NUMBER | DESCRIPTION | EVID. |

*United States District Court*
*Trenton, New Jersey*

| | | |
|---|---|---|
| D-3 | Mercerville Comprehensive Healthcare 3/7/02 | 8 |
| D-4 | Mercerville Comprehensive Healthcare 3/14/02 | 8 |
| D-5 | Mercerville Comprehensive Healthcare 3/28/02 | 8 |
| D-6 | Mercerville Comprehensive Healthcare 4/28/02 | 8 |
| D-7 | MRI Lumbar Spine dated 5/21/02 | 8 |
| D-8 | Mercerville Comprehensive Healthcare 5/6/02 | 8 |
| D-9 | Mercerville Comprehensive Healthcare  6/4/02 | 8 |
| D-10 | Mercerville Comprehensive Healthcare  6/27/02 | 8 |
| D-11 | Mercerville Comprehensive Healthcare  8/1/02 | 8 |
| D-12 | Mercerville Comprehensive Healthcare  8/15/02 | 8 |
| D-13 | Mercerville Comprehensive Healthcare  12/9/02 | 8 |
| D-14 | Hamilton Healthcare Center dated 6/2/03 | 8 |
| D-15 | Hamilton Healthcare Center dated 7/15/03 | 8 |
| D-16 | Hamilton Healthcare Center dated 9/16/03 | 8 |
| D-17 | Hamilton Physical Therapy Services dated 9/12/03 | 8 |
| D-18 | Hamilton Neurology Associates dated 5/2/07 | 8 |
| D-19 | Hamilton Neurology Associates dated 6/5/07 | 8 |
| D-20 | Hamilton Neurology Associates dated 6/19/07 | 8 |
| D-21 | Hamilton Neurology Associates dated 6/27/07 | 8 |
| D-22 | Hamilton Neurology Associates 8/15/07 | 8 |
| D-23 | MRI Lumbar Spine dated 5/21/07 | 8 |
| D-24 | MRI Lumbar Spine dated 11/27/07 | 8 |
| D-26 | CT Lumbar Spine- Post Discogram 10/15/08 | 8 |
| D-28 | Operative Report dated 2/2/09 | 8 |
| D-29 | MRI Cervical Spine dated 2/22/07 | 8 |

*United States District Court*
*Trenton, New Jersey*

| NUMBER | DESCRIPTION | EVID. |
|--------|-------------|-------|
| D-33 | Admission Record dated 2/22/02 to 2/23/02 | 8 |
| D-34 | Admission Record dated 8/18/05 to 8/19/05 | 8 |
| D-35 | Admission Record dated 12/26/06 | 8 |
| D-36 | Admission Record dated 12/29/06 | 8 |
| D-37 | Admission Record dated 5/17/07 | 8 |
| D-38 | Admission Record dated 6/12/07 | 8 |
| D-41 | Records from G. Quille, D.C. | 8 |
| D-42 | Hamilton Neurology Associates 2/12/07 | 8 |
| D-43 | Hamilton Neurology Associates 3/8/07 | 8 |
| D-44 | Hamilton Neurology Associates 4/25/07 | 8 |
| D-45 | Pinnacle Physical Therapy 5/3/07 to 6/1/07 | 8 |
| D-46 | Martin Scott record dated 7/18/07 | 8 |
| D-47 | Princeton Orthopedics Group 7/30/07 | 8 |
| D-48 | Princeton Orthopedics Group 8/2/07 | 8 |
| D-49 | Princeton Orthopedics Group 8/7/07 | 8 |
| D-54 | Redacted transcript of Sania Mahmood 5/24/10 | 8 |
| D-57 | MRI Cervical Spine 5/16/02 | 8 |
| D-58 | Kearny EMS record dated 6/12/07 Joint Exhibit | 8 |

*United States District Court*
*Trenton, New Jersey*

──────COLLOQUY──────

1      THE COURT:  Good morning.  It's Friday morning, we

2  have concluded the evidence in the case.  We had argument

3  yesterday regarding the jury charge.

4      Mr. Segal, I understand that defendants are withdrawing

5  their request for the adverse inference charge.

6      MR. SEGAL:  We are, your Honor.

7      THE COURT:  Thank you, I appreciate that.

8      MR. SEGAL:  No problem.

9      THE COURT:  The remaining to be decided are the

10  plaintiff's objections to the admission of certain exhibits

11  proposed by defendants, specifically, the redacted copy or

12  redacted portion of plaintiff's answers to interrogatories

13  related to the legal action over the 2006 accident, correct?

14      MR. SEGAL:  Yes.  If your Honor wants, I can show you

15  what we did.  We did just go with the very first page, as your

16  Honor said, and then the questions that matched those nine.

17  And then here is also the --

18      THE COURT:  For the record, this would be Defendant's

19  Exhibit, what?

20      MS. MONTE CARLO:  54.

21      THE COURT:  54 is the transcript.

22      MR. SEGAL:  And then the one right after it.  I think

23  it's D-1.

24      THE COURT:  That would be D-1.  I heard argument of

25  counsel with respect to the proposed exhibits, Defendant's

—COLLOQUY—

1   Exhibit 54, related to those aspects of her deposition

2   transcript in this case which were used during her testimony

3   at trial.  I'm going to admit that.  Likewise, I am going to

4   admit the redacted form of plaintiff's answers to Form A

5   interrogatories from the legal action related to the 2006

6   case.

7        Mr. Smith.

8            MR. SMITH:  Judge, may I see that.  I don't think --

9            THE COURT:  You may see both of these.

10           MR. SMITH:  I don't need to see the first one.

11           THE COURT:  I'm giving them back to Mr. Segal so that

12   they can be included in the binder of Plaintiff's Exhibits for

13   admission into evidence.  Okay.

14       All right, folks, the jury instructions will be out in

15   a minute.  They are in the form discussed to which the parties

16   agreed, absent the adverse inference aspect.  It will be

17   presented to you by my law clerk at some point during closing

18   arguments.

19       Mr. Segal, you ready to proceed with closing arguments.

20           MR. SEGAL:  I am, your Honor.  If you can give me one

21   second to put the full binder together and then I don't know

22   if before you bring the jury out, if you want me to move and

23   list all the numbers in the record into evidence or whether

24   you prefer that be in front of the jury or not?  Because I

25   don't think ever been formally identified.

*United States District Court*
*Trenton, New Jersey*

COLLOQUY

1      THE COURT:  That's fine.  Mr. Smith.

2      MR. SMITH:  Judge, I hate to be a burden, but can I

3  have two minutes with counsel.  I notice there is two other

4  redactions that I -- he needed to make.

5      THE COURT:  Why don't you fellows take the two

6  minutes and make sure you have the agreement.  Here come the

7  jury charges for you.  I'd like to get the jury out here as

8  quickly as possible.

9      Mr. Segal, once you made the clarifications with Mr.

10  Smith, you can move into evidence by number the exhibits that

11  you propose.  Likewise, Mr. Smith, you'll move into evidence

12  formally by numbers the exhibits that are in plaintiff's

13  binder.

14      MR. SMITH:  Judge, I'll get them marked and moved

15  them in.

16      THE COURT:  Let's do it promptly.  Let's go off.

17      (Short recess is taken.)

18      THE COURT:  On the record.

19      Mr. Segal, you want to make your application with

20  respect to Defendant's Exhibits.

21      MR. SEGAL:  Yes, your Honor.  We'd like to move into

22  evidence D-3, D-4, D-5, D-6, D-7, D-8, D-9, D-10, D-11,

23  through 24, D-26, D-28, D-29, D-33, through 39, D-41 through

24  D-49, D-57 and -58, and D-1 and D-54 based upon your Honor's

25  last rulings.

─────COLLOQUY─────

```
 1          THE COURT:  I understand there is no objection to the
 2   admission into evidence of the exhibits, Defendant's Exhibits
 3   as listed by Mr. Segal with the exception of exhibits which we
 4   just discussed, D-1 and D-54, as to which I ruled and
 5   therefore they will be admitted.
 6   (Defendant's Exhibit moved in evidence and listed in the
 7   index.)
 8          THE COURT:  Mr. Smith, you have an application with
 9   respect to Plaintiff's Exhibits.
10          MR. SMITH:  Yes, Judge, plaintiff is going to move
11   redacted exhibits --
12          MR. SEGAL:  Wait.  I want --
13          THE COURT:  What do you mean wait?
14          MR. SEGAL:  I'm sorry, your Honor, they're still
15   redacting them.  So I'm not sure when you asked me if I
16   agreed, I don't know if Mr. Smith seen the redaction that the
17   other two lawyers are agreeing on, so I wanted to be fair to
18   him.
19          MR. SMITH:  I'll agree to the redaction.
20          MR. SEGAL:  Okay, that's fine.  I apologize.
21          THE COURT:  Thank you.  Go ahead, Mr. Smith.
22          MR. SMITH:  Judge, plaintiff will move PT-1 through
23   what I've marked PT-14.
24          THE COURT:  Very good.  I understand there are
25   redactions to those documents to which plaintiff agrees and
```

*United States District Court*
*Trenton, New Jersey*

—————CLOSING ARGUMENT - SEGAL—————

1   there is no objection to the admission of Plaintiff's Exhibit

2   PT-1 to PT-14, they will also be admitted.

3   ( Plaintiff's Exhibit moved in evidence and listed in the

4   index.)

5           THE COURT:  Let's get the jury.

6           (At which time the jury was brought into the

7   courtroom and the following took place.)

8           THE COURT:  Good morning, ladies and gentlemen.

9           JURORS:  Good morning.

10          THE COURT:  All right, we reached the point in the

11   trial where the parties are submitting closing arguments and

12   Mr. Segal, on behalf of the defendants, will proceed.

13          MR. SEGAL:  Thank you, Judge.  All right.  It's been

14   a long week.

15       Sometimes you've had to hear things twice, and I will

16   apologize but because things were done out of order, like Dr.

17   Lowe's testimony before the trial started, sometimes you had

18   to hear things more than once.  And I apologize for the length

19   of that, but we're at the point in time where we give the case

20   to you.  And I promise this will be the last time you have to

21   hear my voice.

22       But I first thank you for your time, patience and

23   attention.  I hope that you consider all of the evidence, the

24   testimony, all of the records that we discussed through the

25   trial that I held up that we used, will be presented to you

—————————CLOSING ARGUMENT - SEGAL—————————

1   for your reference if you need it, but, most importantly, I

2   hope that you remembered from Monday that I promised to prove

3   four things:  I promised to you that I would prove that Ms.

4   Mahmood did not provide an accurate accident history.  I

5   promised you that I would prove that she did not provide an

6   accurate medical history.  I promised to you that Ms. Mahmood

7   had longstanding complaints in every part of her body that

8   she's claiming injury to from the accident on June 12th, 2007.

9   And, lastly, that the two hired experts who came in and spoke

10  to you for Ms. Mahmood, although, gave opinions, if you listen

11  carefully, did not give opinions that were valid because they

12  weren't given enough information, they weren't given

13  everything.

14       Clearly, that's the difference between someone like Dr.

15  Fremed who writes a 20-page report and looks at nine red

16  volumes of records; and someone like Dr. Skolnick who claims

17  that he writes a short report for brevity.  And I think, as my

18  parents hope, that I kept my promise.  I was always taught as

19  a kid, the one thing you have in this world that you can

20  control is your word.  And if you lose that, you don't have

21  much left.  So, hopefully, you all think I kept my word and

22  fulfilled those promises.

23       Now, let's just talk briefly about what you did here.

24  You heard in plaintiff's case two experts come in.  You heard

25  Mr. Smith beat up my experts because they were paid.  You all

---CLOSING ARGUMENT - SEGAL---

1  have jobs.  I don't presume that you work for free and neither

2  do they.  Part of their jobs as doctors, because the way the

3  litigation system is setup, is that they also act as experts.

4  And experts get paid for their time.  Because if they're not

5  doing that, they're doing something else to make money, that's

6  why we work.  My dad always taught me if work was fun, then

7  they wouldn't have called it work, they would have called it

8  fun.  We don't do it because it's fun, very few, at least.

9  So, I think that kind of tells you, though, when you are

10  beating someone up for being paid for doing their job, what

11  you're failing to do is beating up what they said.  Remember,

12  not one treating physician came before you in this trial,

13  except for Dr. Lowe.  And we'll get to him.

14        Dr. Pendino, the one person who could have got on the

15  stand under oath and told you, I saw her one week before the

16  accident, I saw her one week after the accident, and I can

17  tell you as a neurologist, there was a difference or there was

18  not a difference.  Didn't bring him in.  We, of course, ask

19  you while you deliberate, to think about that.  We think there

20  is only one reason because that doctor doesn't give the

21  opinion Ms. Mahmood wants.  He stands by his records that

22  document everything remain the same.  Remember, for months she

23  returned to him and did not even report the June 12th, 2007

24  accident.  The accident which supposedly caused all the

25  physical and the psychological injuries.  Please remember

—————————CLOSING ARGUMENT - SEGAL—————————

1    that.  Who did they bring in?  They brought in Dr. Tobe, who

2    saw her one time.  Testified to the straw that broke the

3    camel's back.

4         It's interesting, they didn't bring in Dr. Amin, her

5    treating psychiatrist, who could have personally told you that

6    over time what was going on with Ms. Mahmood and whether

7    things were getting better or worse.  While you deliberate,

8    ask why?

9         Remember, I told you in my opening statement, the bad

10   part of litigation is the defendants don't get to control or

11   treat a plaintiff.  We only get to hire experts to help us

12   prepare our case, to give an opinion that is sometimes

13   unfavorable to what I want, sometimes favorable.  Sometimes

14   they get a report and it says she sustained exactly what she

15   says.  In this case, that's not what happened.  And I think it

16   is a fair opinion.

17        Remember, Dr. Fremed is the only person, the only one,

18   who put films on that machine.  And I believe in his own words

19   were "in black and white."  He showed you that from '02 to '07

20   there was no traumatic change.  There was what he would expect

21   as a neurologist of a degenerative condition which continues

22   over time.

23        Interestingly, not even plaintiff's hired experts put

24   the films up for you.  I didn't see Dr. Skolnick do it.  I

25   didn't see Dr. Tobe do it.  It's important.  Is it because

CLOSING ARGUMENT - SEGAL

1 they never saw them or is it because what they saw, didn't

2 help their cause? Dr. Bills also. He showed you the '07

3 films, and he agreed with Dr. Fremed. He said the same thing,

4 what I see on '07 was not traumatic. It wasn't produced only

5 five months before. This was longstanding. And then the

6 records document the longstanding which leads up to those

7 MRIs. No one else stood before you with a pencil and showed

8 you that on the films. And, remember, I didn't hear Mr. Smith

9 take issue with that testimony. I didn't hear Mr. Smith

10 question Fremed's findings, get on there and say, isn't it

11 true that that's not degeneration? Okay. Instead, what did

12 we get? We got the old adage, Well, you find the plaintiff as

13 you find them as you find them. You get them as you find

14 them, that's what they say in the law. Defendants are stuck

15 with a plaintiff's prior history. And you made it worse, you

16 accelerated it, you aggravated it. You made something

17 symptomatic that was not symptomatic. What's the problem with

18 that?

19 The problem with that is, first, the objective evidence

20 in this case doesn't support a change, a physical change.

21 Number two, the medical records don't support a subjective

22 change. They don't document changed complaints even from Ms.

23 Mahmood. The only time you hear a change is when Ms. Mahmood

24 takes the stand and gives you her testimony. And I hope, like

25 Dr. Fremed said, you turn to the black and white. You turn to

————CLOSING ARGUMENT — SEGAL————

1 | this binder and you say, well, was she completely truthful?

2 | Was she accurate? What do the records say? Were the

3 | complaints the same or not? Do I believe that a doctor didn't

4 | write something down even though she says she said it. We all

5 | have been to our doctors. They are scribbling the whole time

6 | we're talking. And probably because the legal system says you

7 | better to cover yourself. Because nowadays everything

8 | happens. So, turn to the records. The aggravation isn't

9 | there. That's why surgery wasn't until almost February of

10 | '09. Why? Because the progression of her condition that

11 | existed beforehand continued its natural progression.

12 | Where does that take us to? It takes us to the famous

13 | Dr. Lowe, who you heard his video. You heard his testimony.

14 | But I think if you remember in my opening, I told you what you

15 | would never hear from Dr. Lowe. You would never hear him tell

16 | you the surgery I did was because of the accident on June

17 | 12th, 2007. Why is that important, because I believe Dr.

18 | Fremed got bulleted with questions. You're not a

19 | neurosurgeon, you're not the neurosurgeon in this case. You

20 | don't even do these surgeries. He admitted, you're correct.

21 | So, let's turn to the guy who did the surgery. He certainly

22 | could have come here, even by video, and said to you under a

23 | question posed by Mr. Smith, absolutely. What better person.

24 | I believe Mr. Smith's exact words were, Have you ever seen,

25 | Dr. Fremed, a human disc? And Dr. Fremed said, God, it's been

———————CLOSING ARGUMENT - SEGAL———————

1  a long time.  Dr. Lowe saw the condition.  He couldn't have

2  been any closer.  If you thought the MRIs are closer, imagine

3  the neurosurgeon doing the surgery.  He never came by video or

4  otherwise to tell you.  Instead, what did they do?  They ran

5  out and got a hired expert, Dr. Skolnick, who is an orthopedic

6  surgeon, not a neurologist like Dr. Fremed, not a neurosurgeon

7  to bolster Dr. Lowe, an orthopedic surgeon to say, after the

8  surgery, when I saw her, I now will tell you it's related.

9       Listen, we all learn life lessons, and I think if you

10  think about that hard, there is only one conclusion, Dr. Lowe

11  didn't say it, because he couldn't.  He was not willing to

12  bend his reputation, to hurt his reputation, when to say

13  something under sworn oath that he didn't believe.  It doesn't

14  mean Dr. Skolnick didn't believe it.  All I ask you when you

15  weigh the two, I don't think Dr. Skolnick's opinion can hold a

16  candle to that of the person who did the surgery.  And, again,

17  they did bring him into testify.  He's the one treating guy

18  who was brought in.  So, it's not even like Dr. Pendino who

19  they chose to leave out altogether, they brought him.  And he

20  wouldn't say.  Ultimately, as I said in the very beginning of

21  this case, the defendants admitted they caused the accident.

22  The defendants admitted Ms. Mahmood sustained injury.  You've

23  heard what those injuries are.  Those injuries were temporary,

24  minor injuries for which she received adequate treatment.

25       All I ask of you now is when you consider everything

——CLOSING ARGUMENT – SEGAL——

1  that you award her only that sum of money that compensates her

2  fairly for what she sustained as a result of the accident,

3  solely the one accident, June 12th, 2007.  Thank you.

4       THE COURT:  Thank you, Mr. Segal.  Mr. Smith.

5       MR. SMITH:  Thank you, Judge.  Good morning,

6  everyone.

7       JURORS:  Good morning.

8       MR. SMITH:  Let me first join Mr. Segal and thank you

9  for sitting here this week.  I told you in the beginning of

10 this case when we met Monday that this was a dispute that has

11 been hanging around for a long time, and we couldn't resolve

12 it.  And you guys are going to resolve it for us today when

13 you go back into that jury room.

14      Excuse me one second, Judge.

15      THE COURT:  Take your time.

16      MR. SMITH:  Is that okay?

17      THE COURT:  Of course.

18      MR. SMITH:  Mr. Segal, can you see that?

19      MR. SEGAL:  I can by all means.  It's okay.

20 Judge, hope you don't mind I moved.

21      THE COURT:  Not at all.

22      MR. SMITH:  They don't teach you these things in law

23 school, how to put these exhibits up.  Excuse me.

24      Okay, Mr. Segal just ended by eloquently telling you

25 that the defendants admit, they were wrong, they caused the

—————CLOSING ARGUMENT — SMITH—————

1   accident, that wasn't part of the case.  They admit that their

2   truck was negligent, caused the crash on June 12th, 2007.

3   They also admit that Ms. Mahmood suffered injuries.  He just

4   told you that.  There three doctors, three witnesses that came

5   up told you the same thing, yes, we agree, Sania suffered

6   injuries and was hurt and was damaged because of their

7   negligence.  So, that's not going to be really too hard for

8   you guys to think about when you go into the jury deliberation

9   room.  When I get done speaking to you, the Judge is going to

10  speak to you and tell you what the law is to apply to the

11  facts that we think we presented to you in the case.  He's

12  going to give you a little jury verdict form.  And the first

13  question you're going to see on that form for you guys to

14  decide is: Did Sania Mahmood suffer injuries in the accident

15  of June 12th, 2007?  Hopefully, that's an easy one, and you go

16  to the second one.  Because there is no dispute in this case

17  that she did suffer injuries.  The questions that have been

18  raised were the extent of those injuries.

19       The defense spent an awful lot of time with you guys

20  trying to get various witnesses to say there was an

21  inconsistency and somehow Sania Mahmood neglected for whatever

22  reason to tell about her prior accidents.  I didn't neglect to

23  tell you that, that wasn't any surprise.  I told you that

24  Monday.  We told you she was hurt in 2002.  We told you she

25  was hurt in 2006.  Where is the big surprise?

———CLOSING ARGUMENT – SMITH———

1    Sania Mahmood sat up on there on that witness stand for

2  a day and a half.  She told you she had an accident in 2002,

3  she was hurt.  She told you in 2006 she had an accident, she

4  was hurt.  Where is the inconsistencies that they're telling

5  you exist?  We put up witnesses there.  We examined witnesses.

6  Each one of those doctors, even Dr. Fremed told you, yup,

7  going back and reviewing the records he reviewed, Sania was

8  consistent.  She told all the doctors he reviewed about the

9  2002/2006 accident.  She told him.

10    Dr. Bills, Dr. Bills who told you he had no

11  patient/doctor relationship.  He never met her before, never

12  saw her again.  Stranger, they were strangers.  Yet, she was

13  candid and told him about the 2002 and 2006 accident.  Their

14  own witness admitted to you, she was candid and didn't hide

15  it, told him.

16    Now, the defense is trying to make a big deal to you

17  that for some reason, Dr. Lowe, the neurosurgeon, she didn't

18  tell.  Well, she did tell him about the 2006 accident.  But,

19  remember, he doesn't see her for two and a half years, almost

20  two and a half years of the collision with the tractor

21  trailer.  Remember, what Sania went through for those two

22  years.  Is it the primary topic on her mind whether she

23  remembered or not remembered to tell the doctor about the 2002

24  accident or that she hurt her back in 2006?  It wasn't that

25  big a deal to Dr. Lowe.  They tried to make it a big deal.

CLOSING ARGUMENT - SMITH

1  What did Dr. Lowe say. Wouldn't have mattered, because Dr.

2  Lowe was not concerned with what the hired guns are, Dr.

3  Fremed, for instance. He's concerned to try to get an opinion

4  that will help the defense, those who hired him.

5       Dr. Lowe was a doctor who was just trying to find out

6  what was wrong and how he can help her. That's what treating

7  doctors do. They're not detectives. That's their primary

8  concern. Never heard him say that the surgery he did wasn't

9  related to the accident. Never heard him say that.

10       Dr. Skolnick is a board certified orthopedic surgeon.

11  He came in and told you it was related by way of aggravation.

12  I told you in the beginning, I wouldn't stand up here and try

13  to fool you to think that everything we're going to tell you

14  Sania went through is caused or related to that truck

15  accident. We're going to tell you it was by aggravation. And

16  I think we have shown you that. I don't think there is any

17  dispute to that. If you give me a few minutes, I'm just going

18  to highlight some of the things that I think that we have

19  shown to you.

20       We opened up on Monday. Mr. Segal told you, yes, we

21  take responsibility. We took responsibility. We did what we

22  were supposed to. We acknowledge to you folks that we were

23  negligent. He even went as far as to say, we tried to

24  compensate her, we tried to compensate her. Well, they

25  failed. Now, it's going to be your job to compensate her.

—————CLOSING ARGUMENT - SMITH—————

1  Remember, this is a 39-year old woman, a 39-year old

2  woman. And I am going to go through with you just briefly how

3  she was in 2002, how she was in 2006, and what she's been

4  going through for the last four and a half years. The defense

5  doesn't come out and say it, but perhaps they are trying to

6  convince us that that tractor trailer hitting her was just

7  coincidental to the fact that she goes on for four years to

8  have extensive medical treatment. Just a coincidence. Had

9  nothing to do with it.

10  First objective finding, remember, you heard about all

11  the fancy studies and tests and hopefully your medical

12  knowledge is gained a lot since we were here this week. You

13  heard about a test, an EMG study. All the doctors, Dr. Bills

14  admitted that is an objective finding of lumbar radiculopathy

15  and that was positive after the truck collision. There was no

16  positive test or sign of lumbar radiculopathy before the

17  defendant's truck collided with Ms. Mahmood. None. Only

18  after. It's just a coincidence that happened.

19  Dr. Bills told you that's a permanent condition and it

20  can cause pain, which, coincidentally, Sania told you the pain

21  in her legs got worse after being hit by the truck. She told

22  you the numbness in her legs got worse and the tingling got

23  worse. Dr. Bills told you that's all consistent with

24  radiculopathy.

25  She had MRIs, you saw all the fancy films and pictures,

—CLOSING ARGUMENT — SMITH—

1 the true test. Dr. Skolnick told you he reviewed those all.

2 He said there was change in those lumbar findings. Nobody

3 ever suggested that Sania have surgery to her back before

4 being struck by that truck. Nobody. They admit that.

5 Everyone of their doctors I asked, Did you ever see any

6 evidence in the records? Dr. Fremed told you he had rooms

7 full of records he reviewed. Any of those records before June

8 12th, 2007 suggest surgery? No. Only after did. Only after.

9       She went through two and a half years before she had

10 surgery, not like, perhaps was suggested, that she was sitting

11 around waiting for that condition to naturally progress.

12 Instead, she tried to get better. And she went through

13 courses of treatment she had never seen before. Not following

14 the 2002 accident, not following the 2006 accident. But,

15 after getting hit by the truck, she goes to pain management.

16 Sure, might have been some suggestion she might seek pain

17 management doctors before, but did she? No.

18       Pain management doctor she saw, Dr. Sackstein, went at

19 her aggressively, aggressive narcotic pain medications. No

20 records she took any of those or was prescribed narcotics

21 before 2007. Epidural injections. Okay. Just yesterday you

22 heard Dr. Fremed tell you the risks that are involved in that

23 procedure, the risks. And she had multiple epidural

24 injections after being struck by the truck, after, not before.

25 All she had before was some trigger point injections in 2002

—————CLOSING ARGUMENT - SMITH—————

1  which are done in the doctor's office.  These are done to help

2  pain.  Her pain had gotten so severe they needed to try

3  something risky and aggressive.  And she did.  She did.

4       She had not only the epidural that you heard talked

5  about, but SI injections, facet injections in the low back.

6  Same thing, risky.  Dr. Fremed agreed for pain, low back, done

7  in a surgery center.  So, no records of that in those rooms

8  full of records that Dr. Fremed reviewed before the truck

9  accident.  She was on Vicodin and Percocet.  Dr. Lowe told

10  you, Dr. Sackstein, heavy duty pain meds.  Not before, but

11  after the truck accident.  She underwent a discogram.  Dr.

12  Fremed told you it was risky.  Dr. Lowe explained it in very

13  detail to you on that videotape, what that's all about, a

14  painful and uncomfortable procedure where needles are stuck

15  into the suspected areas of the low back to reproduce the pain

16  that the dye shoots out, it's an objective finding something

17  is going on there that's wrong.  In fact, Dr. Lowe told you, I

18  don't know if his eyes are different than Dr. Fremed, but he

19  saw the dye actually leak out in the CAT scan following the

20  procedure which Dr. Fremed told you that would be evidence of

21  a herniated disc.  Dr. Lowe saw it and told you, there it was,

22  showed it to you on the board, how the dye was leaking out.

23  That positive discogram led her to Dr. Lowe to do surgery.

24       Now, Dr. Fremed, the neurologist who sits in his office

25  and earns over 60 percent of his income on an annual basis for

---CLOSING ARGUMENT - SMITH---

1  the last 20 years doing examinations like this for the

2  defense.  But he said he could question that it was improper

3  and not a good thing to do a discogram before the surgery.  He

4  questioned a board certified neurosurgeon.  He, who hadn't

5  seen the inside of a spine or a human disc for over 20

6  something years, is going to question a neurosurgeon's plan.

7  Understandably, understandably Sania has been emotionally

8  damaged as a result of the physical pain she's been through,

9  the inability to get herself fixed.  She's been treating with

10 a psychiatrist, Dr. Amin.  And she has never had been treating

11 with a psychiatrist before the truck accident, which everyone

12 of the doctors and witnesses on our side and on the defense

13 told you that truck accident was a traumatic event.  I don't

14 know there would be much dispute when you go back into that

15 room as to think that would be a traumatic event for anyone.

16 This is what happened to Sania Mahmood.

17      Now, she's taking Prozac.  Nowhere before June 12th,

18 2007, was it indicated, suggested, or documented that she was

19 taking any anti-depressants.  In 2002, for two weeks, she was

20 prescribed Zoloft, for two weeks in 2002.  That is not the

21 same or the type of treatment she continues to get and has

22 gotten with Dr. Amin.

23      Low back surgery.  You guys got to see an up close

24 explanation as to what happens -- or what happened to Sania

25 Mahmood in her surgery.  Dr. Lowe, as I told you, a board

─────────CLOSING ARGUMENT – SMITH─────────

1 certified neurosurgeon. Defense questions why he didn't come

2 and tell you an opinion about how long or whether the surgery

3 was related. Again, he told you. Didn't matter. Didn't

4 matter. He was trying to fix her. That's what treating

5 doctors do. The opinion games that usually comes up with

6 folks like Dr. Fremed who makes his living coming into court

7 to give opinions for defense. Four hours she's under

8 anesthesia, two level fusion of the low back, cutting,

9 grafting, hardware, screws put into the bones. You saw that.

10 That's going to be there for ever, never coming out, never

11 coming out. And those room full of records that Dr. Fremed

12 said he reviewed, not once was there mention of surgery. Not

13 once was there any surgery, until after being in the collision

14 with the truck, defendant's truck.

15     I keep reaching for the remote control like I did so

16 well on that video. 2002, she has the car accident. She

17 treats until sometime early 2003, most of 2003, 2004, 2005,

18 almost all of 2006, until December of 2006 when she has the

19 second car accident, she has no medical treatment, she has no

20 complaints. You saw no evidence of any medical treatment

21 during that time, nor no complaints to her back or her neck.

22 How bad was that 2002 episode. The 2006 car accident for

23 which she told you about. Two-car accident, she misses a

24 couple weeks of work. She receives about eight weeks of

25 chiropractic treatment and starts seeing with Dr. Pendino. We

*United States District Court*
*Trenton, New Jersey*

─────CLOSING ARGUMENT ─ SMITH─────

1   told you that.  We admitted to you that.  We told you even at

2   the time that she's struck by the truck, she was still seeing

3   Dr. Pendino.  She told you that, I told you that.  Repeat MRIs

4   are done, she has a short physical therapy period but no

5   narcotic pain medications, no epidural injections, no surgery,

6   no complaints, nightmares, anxiety, depression, no treatment.

7   She's trying to go to the gym.  No pain management.  May have

8   been talked about, but never it was so bad that she went

9   there.

10       2006, I'm not going to rehash what I just already

11   rehashed with you, but the quality, and the quantity of the

12   medical treatment she received, couldn't and didn't compare to

13   anything she had seen since 2002, none of it, none of it.  She

14   treated consistently from June 12th of 2007 right up until

15   2010 when she told you she saw Dr. Ibrahim for some more

16   epidural injections into her neck.  Four years of treatment.

17   She saw many doctors, okay, and the defense tells you, whoa,

18   we didn't bring any of the treating doctors in.  As you guys

19   heard and can guess that costs money, that costs money.  We

20   could have brought in all the treating doctors to say the same

21   thing Dr. Skolnick said.  She saw Dr. Palmer, Princeton

22   Orthopedics Group.  He treated her for the neck and back, gave

23   her medication, gave her therapy.  Dr. Charuk, she saw shortly

24   after the accident.  She was having nightmares, flashbacks,

25   trouble with processing life.  She had the epidural that we

*United States District Court*
*Trenton, New Jersey*

─────CLOSING ARGUMENT - SMITH─────

1  talked about.  We talked about Dr. Lowe and Dr. Amin.

2       So, I'm getting back to the perhaps the reasons you

3  guys need and I want to ask you to consider when you go back

4  into that jury room, why the defendants took the position they

5  took and spent all that time telling you about 2002, 2006,

6  trying to make Sania Mahmood look like a liar, when all she

7  did was tell everybody, except for Dr. Lowe.  Why would they

8  do that?  Because people who don't want to accept full

9  responsibility for their actions, try to blame the victim.   It

10 happens in all spectrums.  You hear a lot times about young

11 woman perhaps being sexually assaulted and then they're put on

12 the stand at trial, what were they wearing, what were they

13 doing to induce that kind of behavior.  That's what people do

14 who try to avoid responsibility.

15      I'm going to tell you an old story about something we

16 call crackpot defense in the law, perhaps you guys have heard

17 it, perhaps you guys have lived it.  But it goes like this:

18 Think about a kid coming home from school, perhaps he's with

19 his friend going into an area of the house that mom says you

20 shouldn't go in, they go in.  Horse playing around, being

21 careless, being negligent, boom, mom's favorite vase falls and

22 breaks, cracks.  The kids, what am I going to do, I have to

23 fix it before my mom finds out and I get in trouble.  Gets the

24 vase up, glues it up, puts it back up on the stand.  Mother

25 comes home, a few days later notices the cracks, confronts the

*United States District Court*
*Trenton, New Jersey*

———CLOSING ARGUMENT - SMITH———

1   little boy, Did you break this pot? No, mom, I didn't do it.

2   Mom pressures him on. Kid finally says, Okay, I did it.

3   Okay, I did it, but we didn't damage it. Mom knows that's

4   crazy because she sees the glue marks and the scotch tape.

5   Well, okay, we did it, we damaged it, but it was already

6   damaged before we got it, before we broke it. Sound familiar?

7   That's what people do who try to avoid responsibility.

8   Accepting blame for this accident, there was no alternative.

9   That's not the end of the line. Sania Mahmood is entitled and

10  was entitled to be compensated for how she has been injured,

11  harmed and damaged. And there are various factors the judge

12  will read to you that you should consider in that regard, and

13  I am going to ask you to consider as well.

14       The pain and suffering she's gone through since June

15  12th, 2007, it would be -- it's absurd for the defendants to

16  tell you that was the same pain and suffering she was going

17  through before. Before. She never went through what she's

18  gone through since being struck by the truck. Her quality of

19  life has changed. She told you how she wishes she could do

20  things differently, she continues to have pain, continues to

21  have restrictions. She is only 39 years old.

22       The judge is going to tell you something about the life

23  expectancy she has. And I ask you to consider that because

24  each day for the rest of her life, she also to live with those

25  screws and hardware in her back. Each day for the rest of her

—————CLOSING ARGUMENT - SMITH—————

1    life, she has to live with the pain, the restrictions.  Think

2    of that when you are deciding how we can compensate her fairly

3    and reasonably.

4         The evidence is clear that we presented to you in

5    various forms:  Dr. Lowe, Dr. Skolnick, Dr. Tobe, medical

6    records that I am going to present to you to take back and

7    look at.  She is entitled to a verdict for damages.  Okay.

8    They wanted to compensate her, but you're going to for

9    damages.  This is the only time Sania Mahmood -- I'm sorry,

10   gets to come to this court and make a claim to you.

11        When she leaves later today, when she has that pain,

12   when she has that restriction because of those screws in her

13   back a week from now, a month from now, a year from now, she

14   can't come back.  This is it.  Today.

15        So, when you do compensate her, I ask you, please,

16   compensate her fully and completely.  They tried to compensate

17   her, they failed.  I'm confident you guys won't.

18        Thank you for listening to me and thank you for sitting

19   on the jury.  Thank you.

20        THE COURT:  Thank you, Mr. Smith.

21        Ladies and gentlemen, we've come to the point in the

22   process where you receive the charge, the description of your

23   responsibility as you now take this case for deliberation.

24        Over the last four days, you've heard the evidence

25   presented by the parties in this case.  The evidence consists

*United States District Court*
*Trenton. New Jersey*

―――――JURY INSTRUCTIONS ― COURT―――――

 1  of, number one, the testimony that you heard from the

 2  witnesses who appeared in court as well as on the videotape.

 3  Number two, the exhibits, or documents, that have been marked

 4  into evidence.  Number three, the deposition testimony and

 5  answers to interrogatories that were read into the record.

 6  And, number four, the stipulations that were placed on the

 7  record.  As you recall, the stipulations are facts that the

 8  parties agree are true.  And I'll tell you what some of those

 9  stipulations are in just a minute and that you can accept

10  these stipulations as true in your deliberations.

11       I remind you that any testimony that I have stricken

12  from the record during the course of the trial is not evidence

13  and should not be considered by you in your deliberations.

14  This means that even though you may remember that testimony,

15  you're not to use it in your deliberations or your

16  discussions.

17       Further, any limiting instructions that I gave as to

18  how to use certain evidence must be followed.  And that

19  evidence must be considered for that purpose only.  You cannot

20  use it for any other purpose in your deliberations.

21       The burden of proof.  The burden of proof is on the

22  plaintiff to establish her claim by a preponderance of the

23  evidence.  In other words, if a person makes an allegation

24  than that person must prove it.  In this case, Ms. Mahmood

25  claims that she sustained permanent injuries as a result of

——————JURY INSTRUCTIONS - COURT——————

1    the motor vehicle accident on June 12th, 2007.  Defendants

2    deny those claims.  In a moment, I'll give you more detailed

3    instructions on the applicable law and those instructions

4    should control your deliberations and decision.

5           Preponderance of the evidence.  In this case, as I just

6    mentioned, Ms. Mahmood has the burden of proving her case by a

7    preponderance of the evidence.  That means Ms. Mahmood has to

8    prove to you, in light of all the evidence, that what she

9    claims is more likely than not.  To say it differently, if you

10   were to put the evidence favorably to Ms. Mahmood and the

11   evidence favorably to the defendants on opposite sides of the

12   scale, Ms. Mahmood would have to make the scale tip to her

13   side.  If Ms. Mahmood fails to meet this burden, your verdict

14   must be for the defendants.  If after considering all the

15   evidence, you find that a claim or fact is more likely than

16   not, than that claim or fact has been proved by a

17   preponderance of the evidence.  In determining whether any

18   fact has been proved by a preponderance of the evidence, you

19   may consider the testimony of the witnesses, regardless of who

20   called them and all of the exhibits received in evidence

21   regardless of who produced them.

22          Direct and circumstantial evidence are inferences.

23   Evidence may be direct or circumstantial.  Direct evidence is

24   proof of a fact such as the testimony of an eye witness.

25   Circumstantial evidence sometimes called inferences consists

---JURY INSTRUCTIONS - COURT---

1   of a chain of circumstances pointing to the existence of a

2   fact or facts.  Circumstantial evidence is based upon

3   deductions or logical conclusions that you reach from direct

4   evidence.

5        Let me give you an example.  If a witness testified

6   that he or she observed snow falling last night, that would be

7   an example of direct evidence.  On the other hand, if a

8   witness testified that there was no snow on the ground before

9   he went to sleep, that when he arose in the morning, there was

10   snow on the ground, you can infer from these facts that it had

11   snowed during the night.  That would be an example of

12   circumstantial evidence.  You may consider both direct and

13   circumstantial evidence in deciding the case.  The law permits

14   you to give equal weight to both.  In any event, it is for you

15   to decide how much weight to give any of the evidence.

16        Credibility.  Credibility means whether a witness is

17   worthy of belief.  You must decide which witnesses to believe

18   and to what extent and which witnesses not to believe.

19   Regardless of whether the witness was a lay person or an

20   expert, you may believe everything that witness said or only

21   part of it or none of it.  You are the sole judges of the

22   credibility of the witnesses.  In deciding what testimony to

23   believe, you may take into consideration the following things:

24   The witness's interest, if any, in the outcome of the case;

25   the accuracy of the witness's recollection; the witness's

*United States District Court*
*Trenton, New Jersey*

─────JURY INSTRUCTIONS - COURT─────

1    ability to know what he or she is talking about; the

2    reasonableness of their testimony; their demeanor on the

3    stand; the witness's apparent candor or evasion, their

4    willingness or reluctance to answer questions; the inherent

5    believability of their testimony; and the presence of any

6    inconsistent or contradictory statements.  The law recognizes

7    a statement or an adage called "falls in one, falls in all."

8    If you believe that any witness lied on any fact significant

9    to your decision in this case, you have the right to reject

10   all of that witness's testimony.  However, in your discretion,

11   as I said, you may choose to believe some parts of the

12   testimony and not believe other parts.

13        During the trial, you heard testimony containing

14   opinions from certain witnesses.  In weighing this opinion

15   testimony, you may consider the witness's qualifications, the

16   reasons for their opinions and the reliability of the

17   information supporting those opinions as well as the other

18   factors that I previously mentioned for weighing testimony of

19   witnesses.  The opinion of the witness should receive whatever

20   weight and credit, if any, you think appropriate, given all

21   the other evidence in the case.  In deciding whether to accept

22   or rely upon the opinion of a witness, you may consider any

23   bias the witness may have, including any bias that may arise

24   from evidence that the witness has or will be paid for

25   reviewing the case and testifying, or from evidence that the

*United States District Court*
*Trenton, New Jersey*

JURY INSTRUCTIONS - COURT

1  witness testifies regularly and makes some of their income

2  from testifying in court.

3      We spoke about stipulations.  The parties in this case

4  have stipulated that certain facts are true.  These are their

5  stipulations.  Number one, a motor vehicle accident occurred

6  on June 12th, 2007 in the northbound lanes of the New Jersey

7  Turnpike.  Number two, defendants are responsible for the

8  happening of that accident.  And, number three, the plaintiff,

9  Ms. Mahmood, is not seeking damages for any lost wages or

10  other loss of income.  Based on these stipulations, you must

11  treat these facts as having been proved for purposes of this

12  case.

13      Redactions.  The parties have requested, and I have

14  ordered, that certain language be struck or redacted from some

15  of the documents which have been admitted into evidence.

16  You'll have those exhibits available to you for your

17  deliberations.  What I am instructing you that you should not

18  make any inferences as to what the redacted portions may or

19  may not have contained.  That means that when you consider the

20  evidence and these exhibits, you should not consider any

21  redaction, any missing information in any way, positive or

22  negative.

23      Proximate cause.  In this case, the defendant trucking

24  company has conceded that the driver of the truck was

25  negligent.  However, the defendants dispute what injuries, if

———————JURY INSTRUCTIONS - COURT———————

1  any, were sustained by Ms. Mahmood as a result of the accident

2  on June 12th, 2007.  You must first determine if the conceded

3  negligence of the defendant truck driver was a proximate cause

4  of any injuries sustained by Ms. Mahmood.  Thereafter, if you

5  determine that Ms. Mahmood did indeed sustain injuries in the

6  June 12th, 2007 accident, then you must determine which

7  injuries, if any, should be compensated bearing in mind my

8  instructions regarding aggravation of a preexisting condition

9  as well as my instructions regarding damages and life

10  expectancy.

11      Damages.  I'm about to instruct you on the law

12  concerning damages.  The fact that I am instructing you on

13  damages should not be considered as suggesting any view by me,

14  one way or the other, that Ms. Mahmood is entitled to recover

15  damages in this case.  Instructions on damages are given for

16  your guidance in the event that you conclude that Ms. Mahmood

17  is entitled to a verdict.  I am required to provide these

18  instructions on damages in all cases where the trial includes

19  such claims.

20      As I said, Ms. Mahmood has the burden of establishing

21  by a preponderance of the evidence each element of the damages

22  she sees.  She must also prove that the damages were the

23  natural and probably consequences of the defendant's

24  negligence.  The accident must have been a proximate cause of

25  the damages and may not be based on conjecture or speculation.

JURY INSTRUCTIONS - COURT

1   In this case, Ms. Mahmood is seeking damages for the injuries,

2   the pain and suffering, and the loss of quality of life that

3   she claims she suffered as a result of the June 12th, 2007

4   accident.  I'd like to discuss these categories of damages for

5   a moment.

6        The injuries are those physical and mental or emotional

7   injuries alleged by Ms. Mahmood during the trial.  She alleged

8   that she has experienced physical and mental or emotional pain

9   and suffering and a loss of quality of life.  No evidence of

10  the dollar value of the physical, mental, or emotional pain

11  and suffering or disability or loss of a normal life has been

12  or needs to be introduced.  There is no exact standard for

13  setting the damages that be can awarded on account of pain and

14  suffering.

15       If you find she has sustained an injury, you are to

16  determine an amount that will fairly compensate her.  However,

17  you may conclude that she is not entitled to compensation for

18  an injury that she did sustain.  As I previously mentioned,

19  Ms. Mahmood is not making any claim for lost income;

20  therefore, you're not to consider that claim in your

21  deliberations concerning damages.

22       Aggravation of a preexisting injury.  In this case,

23  evidence has been presented that Ms. Mahmood already had

24  injuries to her neck, back, shoulders and knees prior to the

25  accident in June of 2007.  I will refer to this condition as

*United States District Court*
*Trenton, New Jersey*

—————————JURY INSTRUCTIONS - COURT—————————

1  the preexisting injury.  There are difference rules for

2  awarding damages depending on whether the preexisting injury

3  has or has not caused the plaintiff any harm or symptoms at

4  the time of the June 12th, 2007 accident.  The defendants in

5  this case are not responsible for any preexisting injury of

6  the plaintiff.  As a result, you may not award any money in

7  this case for damages which you conclude are attributable

8  solely to the preexisting injury.  However, if the plaintiff

9  was experiencing symptoms of a preexisting condition at the

10 time of the June of 2007 accident and that those symptoms were

11 made worse in any way, then the plaintiff may recover for an

12 aggravation, or a worsening, of a preexisting injuries, but

13 only to the extent of that aggravation.  For example, if you

14 find that Ms. Mahmood had a preexisting injury to her lumbar

15 or cervical spine prior to the motor vehicle accident in June

16 of 2007, and that those injuries were aggravated by the 2007

17 accident causing her to seek further medical treatment, then

18 Ms. Mahmood is entitled to recover money damages for the pain,

19 suffering, disability, or loss of enjoyment of life

20 attributable to the aggravation.  However, if you find that

21 her preexisting injuries were not aggravated by the June 2007

22 accident, then she is entitled under our law to no recovery.

23        Pain and suffering and loss of enjoyment of life.  If

24 you find that Ms. Mahmood sustained injuries as a result of

25 the June of 2007 accident, she is entitled to recover fair and

JURY INSTRUCTIONS - COURT

1  reasonable money damages for the full extent of the harm

2  caused, no more, no less.  A plaintiff who is awarded a

3  verdict is entitled to a fair and reasonable compensation or

4  award for any permanent or temporary injury resulting in

5  disability to or impairment of her faculties, health, or her

6  ability to participate in activities as a proximate result of

7  defendant's negligence.  Disability or impairment means

8  worsening, weakening or loss of faculties, health or ability

9  to participate in activities.  It includes the inability to

10  pursue one's normal pleasure and enjoyment.  You must

11  determine how the injuries deprive Ms. Mahmood of her

12  customary activities as a whole person.  This measure of

13  damages is what a reasonable person would consider to be

14  adequate and just under all the circumstances of the case to

15  compensate Ms. Mahmood for her injuries and her consequent

16  disability, impairment and loss of enjoyment of life.

17      The law also recognizes, as proper for recovery, the

18  pain, physical and mental suffering, discomfort and distress

19  that a person may endure as a natural consequence of injury.

20  The measure of damages is what a reasonable person would

21  consider to be adequate and just under all the circumstance to

22  compensate Ms. Mahmood.  Here are some factors you may want to

23  take into account when fixing the amount of an award for

24  disability, impairment, loss of enjoyment of life, pain and

25  suffering.  You may consider Ms. Mahmood's age, her usual

JURY INSTRUCTIONS - COURT

1  activities, occupation, family responsibilities and other
2  similar relevant facts to evaluate the probable consequences
3  of any injury you find that she has suffered.  You are to
4  consider the nature and character and seriousness of any
5  injury, discomfort or disfigurement.  You must also consider
6  their duration, as any award you make, must cover the damages
7  suffered by Ms. Mahmood since the accident, to the present
8  time and even into the future, if you find that Ms. Mahmood's
9  injury and its consequences have continued to the present time
10  and can be reasonably expected to continue into the future.
11       In this instance, Ms. Mahmood is 39 years old.  In a
12  moment, I'll speak to you about her life expectancy.  The law
13  does not provide you with any table, any schedule, or any
14  formula by which a person's pain and suffering, her
15  disability, impairment or loss of enjoyment of life may be
16  measured in terms of money.  That amount is left to your sound
17  and sole discretion.  You are to use your discretion to
18  attempt to make the plaintiff whole so far as money can do so
19  based upon sound reason and judgment, without any passion,
20  without any prejudice, without any bias or sympathy.  You each
21  know from your common experience, the nature of pain and
22  suffering, the nature of disability of impairment and loss of
23  enjoyment of life; and you also know the nature and function
24  of money.  The task of equating the two so as to arrive at a
25  fair and reasonable award of damages requires a high order of

JURY INSTRUCTIONS - COURT

1  human judgment.  For this reason, the law can provide no

2  better yardstick for your guidance than your own impartial

3  judgment and experience.  So, you are to exercise sound

4  judgment as to what is fair, just and reasonable under all of

5  the circumstances.  After considering all of the evidence, you

6  shall award a lump sum of money that will fairly and

7  reasonably compensate Ms. Mahmood for her pain, suffering,

8  disability, impairment and loss of enjoyment of life.

9       With respect to life expectancy, if you make an award

10  for future pain and suffering, disability, impairment, loss of

11  enjoyment of life, you may consider her life expectancy.  Ms.

12  Mahmood is currently 39 years old.  Actuarially, her life

13  expectancy is 41.1 years.  That's an estimation of the

14  probably length of her life based on statistical data.  Since

15  it's a general estimate, you should use it with caution in

16  this case.  Ms. Mahmood may live longer or shorter period of

17  time than the estimated figure I gave you.  You should

18  exercise, as I said, your sound judgment in applying life

19  expectancy figures.  It is not a necessary or a fixed rule.

20       I mentioned prejudice, passion, bias, sympathy a moment

21  ago.  Ladies and gentlemen, you have seen and heard all the

22  evidence and the arguments, the attorneys, and the parties

23  have presented.  You have two basic duties.  The first is to

24  decide the facts based solely on the evidence presented in the

25  case.  I mentioned that at the beginning.  This is your job

JURY INSTRUCTIONS - COURT

1  and yours alone.

2       The second duty is to apply the law as I have just

3  explained it to you in light of the facts, even if you

4  disagree with the law.  I know you have listened intently

5  because I have watched you.  And you will perform these duties

6  fairly and impartially.  You must not allow any sympathy that

7  you feel, any prejudice that you may have, any fear or concern

8  about public opinion to influence you.  Nothing I said or did

9  during the trial was meant to indicate any opinion on my part

10 about what the facts are or what your verdict should be.  Your

11 oath as jurors requires you to decide this case fairly and

12 impartially, without sympathy, passion, bias, or prejudice.

13 You are to decide this case solely based on the evidence that

14 you find believable in accordance with the rules of law that I

15 have just given you.

16      With respect to your deliberations, you're not to be

17 advocates for either party, you are to be judges of the facts.

18 Your sole interest is to determine the truth from the evidence

19 in this case.  It's now your duty to confer with one another,

20 to deliberate with a view to reaching an agreement.  Do so

21 without compromising your individual judgment.  Each of you

22 must decide the case for yourself.  Do so only after impartial

23 consideration of all the evidence with your fellow jurors.

24      When you retire to the jury room to deliberate, I'm

25 going to give you these instructions, I'm going to give you

*United States District Court*
*Trenton, New Jersey*

─────────JURY INSTRUCTIONS – COURT─────────

1 | the exhibits that have been admitted into evidence.

2 |    Juror No. One will serve as your foreperson.  She will

3 | preside over your deliberations and speak for you once you

4 | return to the courtroom.  Once you start deliberating, please,

5 | do not talk to anyone other than your fellow jurors about the

6 | case during your deliberations.  Please don't communicate with

7 | anyone on the outside or seek any information from the outside

8 | regarding the case, you must not use, as I said earlier, any

9 | electronic device or media, cell phone, smartphones, any

10 | computers of any kind, either to communicate or obtain

11 | information about the case.  Please don't conduct any research

12 | about the case until after I had accepted your verdict.

13 |    If you have any questions, or messages for me, write

14 | them on a slip of paper, we'll be sure you have a pad and

15 | pencil, give them to my courtroom deputy, she will give it to

16 | me and I'll respond quickly to any questions you may have.

17 | One more thing about messages.  You should not write down, or

18 | tell anyone, how you stand on your votes.  Your votes should

19 | stay a secret until you are finished.  Your verdict will

20 | represent the considered judgment of each juror.  In order for

21 | you as a jury to return a verdict, each juror must agree, it

22 | must be unanimous.

23 |    I prepared a jury verdict sheet which I will give you

24 | as well.  The sheet has the questions that you must consider

25 | and the order in which you should consider them.  There are

————JURY INSTRUCTIONS - COURT————

1   three questions:   The first question is, Do you find that Ms.

2   Mahmood has sustained injuries as a result of the June 12th,

3   2007 motor vehicle accident?   Yes or no.   If your answer is

4   no, your deliberations may cease and you'll return to the

5   courtroom.   If your answer is yes, you move on to question

6   number two.   Were the defendants a proximate cause of the

7   injuries sustained by Ms. Mahmood in that accident?   Again,

8   yes or no.   If your answer is no, your deliberations will

9   cease and you'll return to the courtroom.   If your answer is

10  yes, you move to the third question, What amount of money

11  would fairly and adequately compensate Ms. Mahmood for the

12  injuries, pain and suffering and loss of quality of life she

13  suffered as a result of the June 12th, 2007 motor vehicle

14  accident?   Answer the questions on this sheet, when you

15  completed that task, alert my courtroom deputy and we'll

16  return to the courtroom and take your verdict.

17        That concludes the jury instructions.   The case is now

18  in your hands, and you are discharged to the jury room to

19  begin your deliberations.   Thank you.

20        We'll send the exhibits in momentarily.   Thank you.

21        (At which time the jury was excused from the

22  courtroom to deliberate.)

23  RICHARD KRZACZEK, CSO, SWORN.

24        THE DEPUTY COURT CLERK:   All rise.

25        (At which time the jury was brought into the

*United States District Court*
*Trenton, New Jersey*

-884a-

VERDICT

1   courtroom and the following took place.)

2           THE COURT:  All right.  In the matter of Sania

3   Mahmood versus Joseph Narciso, ladies and gentlemen of the

4   jury, have you reached a verdict?

5           FOREPERSON:  Yes.

6           THE COURT:  Do you have the jury verdict sheet that I

7   have gave you?

8           FOREPERSON:  Yes.

9           THE COURT:  Madame foreperson, with respect to

10  question number one, Do you find that Ms. Mahmood sustained

11  injuries as a result of the June 12th, 2007 motor vehicle

12  accident?  The jury has answered, Yes.  Is that correct?

13          FOREPERSON:  Correct.

14          THE COURT:  Was that determination unanimous?

15          FOREPERSON:  Yes.

16          THE COURT:  Did all seven of the jurors deliberate

17  with respect to that question?

18          FOREPERSON:  Yes.

19          THE COURT:  With respect to question number two, Were

20  the defendants, Joseph Narciso and Mayflower Transit, a

21  proximate cause of the injuries sustained by Ms. Mahmood as a

22  result of the June 12th, 2007 motor vehicle accident.  The

23  jury has answered, Yes.  Is that correct?

24          FOREPERSON:  Yes.

25          THE COURT:  And was that determination unanimous to

──────────VERDICT──────────

1 | all of the jurors deliberating?

2 |       FOREPERSON:  Yes.

3 |       THE COURT:  With respect to question number three,

4 | What amount of money would fairly and adequately compensate

5 | Ms. Mahmood for the injuries, pain and suffering and loss of

6 | quality of life she suffered as a result of the June 12th,

7 | 2007 motor vehicle accident.  The jury's verdict is $25,000.

8 | Is that correct?

9 |       FOREPERSON:  Yes.

10 |       THE COURT:  Was that determination unanimous and

11 | deliberated upon by all of the jurors?

12 |       FOREPERSON:  Yes.

13 |       THE COURT:  Ladies and gentlemen, thank you, that

14 | concludes your service in this matter.  You have the

15 | appreciation of the parties as well as the Court for your

16 | faithful and diligent service in this matter throughout the

17 | course of the week.  You're excused.

18 |      Ladies and gentlemen, remain in the courtroom while the

19 | jury exits.  Thank you for your service.

20 |       (At which time the jury was excused from the

21 | courtroom.)

22 |       THE COURT:  You can be seated.

23 |       Counsel, you heard the verdict, are there any

24 | applications that we should take today?  Mr. Smith?

25 |       MR. SMITH:  I don't have anything today, your Honor,

*United States District Court*
*Trenton, New Jersey*

―――VERDICT―――

1   but will reserve pursuant to the rules.

2          THE COURT:  Clearly you have that right.  Mr. Segal?

3          MR. SEGAL:  The only application will be on the offer

4   of judgment, and I'll discuss that with my client first.

5          THE COURT:  Very good.  Well, as I said to counsel

6   during the break, this has been a long fought and contentious

7   case.  I appreciate the professional way in which both sides

8   conducted themselves throughout.  There were meddlesome issues

9   which we got through, but your advocacy, your skills and your

10  talents were evident throughout.  And I am appreciative for

11  your diligence and effort.  Thank you very much.

12         Ms. Mahmood, good luck to you.

13         MS. MAHMOOD:  Thank you.

14         MR. SEGAL:  Thank you again for your time, Judge.

15         MR. SMITH:  Thank you, Judge.

16

17         (The matter is concluded.)

18

19

20      *        *        *        *        *        *

21

22

23

24

25

*United States District Court*
*Trenton, New Jersey*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON DIVISION**

| | | |
|---|---|---|
| **SANIA MAHMOOD,** | ) | Case No. 03:09-cv-02656-DEA |
| | ) | |
| **Plaintiff,** | ) | Courtroom No. 6W |
| | ) | Clarkson S. Fisher Building |
| **versus** | ) | & U.S. Courthouse |
| | ) | 402 East State Street |
| **JOSEPH NARCISO,** *et al.,* | ) | Trenton, New Jersey 08608 |
| | ) | |
| **Defendants.** | ) | October 16, 2012 |
| | ) | 9:26 A.M. |

TRANSCRIPT OF MOTION HEARING AND ORAL ARGUMENT HELD RE: DEFENDANT'S
MOTION FOR ATTORNEY'S FEES [87]; PLAINTIFF'S MOTION FOR NEW
TRIAL [89]; PLAINTIFF'S MOTION TO WITHDRAW AS ATTORNEY [93].
BEFORE HONORABLE DOUGLAS E. ARPERT
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          Pellettieri, Rabstein & Altman
                            By:  MICHAEL PARAGANO, ESQ.
                                 THOMAS R. SMITH, ESQ.
                            100 Nassau Park Boulevard, Suite 111
                            Princeton, New Jersey 08540


For the Defendants:         Weber Gallagher Simpson Stapleton
                            Fires & Newby LLP
                            By:  JEFFREY SEGAL, ESQ.
                            305 Fellowship Road, Suite 200
                            Mount Laurel, New Jersey 08054

ESR/Courtroom Deputy:       Charmaine Ellington

**TRANSCRIPTION SERVICE:**    **TRANSCRIPTS PLUS, INC.**
                            **435 Riverview Circle**
                            **New Hope, Pennsylvania 18938**
                            **Telephone: 215-862-1115**
                            **Facsimile: 215-862-6639**
                            **e-mail CourtTranscripts@aol.com**


Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

2

## INDEX

| | Page |
|---|---|
| DEFENDANT'S MOTION FOR ATTORNEY'S FEES [87] | 3 |
| PLAINTIFF'S MOTION FOR NEW TRIAL [89] | 10 |
| PLAINTIFF'S MOTION TO WITHDRAW AS ATTORNEY [93] | 21 |

3

 1

 2          (Call to order of the Court)

 3          THE COURT:   This is the matter of Mahmood versus

 4   Narciso and others.   It is civil action 09-2656.   By virtue of

 5   the parties consent, I have jurisdiction over this matter.

 6          May I have your appearances, please?

 7          MR. SMITH:   If Your Honor please, Thomas R. Smith of

 8   the firm of Pellettieri, Rabstein & Altman on behalf of the

 9   plaintiff.

10          Your Honor, I also have my associate with me today,

11   Michael Paragano who will argue one of the motions before Your

12   Honor.

13          THE COURT:   Nice to see you again, Mr. Smith.

14          MR. SMITH:   Thank you, Judge.

15          MR. SEGAL:   Jeffrey Segal from Weber Gallagher on

16   behalf of the defendants, Your Honor.

17          THE COURT:   Good morning, Mr. Segal.   Nice to see

18   you.

19          MR. SEGAL:   Same.

20          THE COURT:   Good morning.

21          FEMALE SPEAKER:   Good morning.

22          THE COURT:   All right.   The first application -- we

23   have four this morning.   The first application I have is

24   defendants' motion for fees based upon the offer of judgment

25   rule.   It's defendants' motion, and it's unopposed.   And,

4

1  therefore, the motion will be granted.

2       Mr. Segal, as a practical matter, how do you see that

3  -- the affect of that working with respect to the judgment

4  amount?

5       MR. SEGAL:  Well, I think that parlays into one of

6  the other motions by plaintiff's counsel with respect to -- I

7  believe plaintiff seeks an order to have the judgment against

8  the check that would satisfy the check made payable directly to

9  the firm to cover costs incurred.  And we don't believe that

10  that's appropriate or fair.  I don't know if you want me to

11  argue that now.

12       THE COURT:  I don't want you to argue it.  What I'm

13  asking is -- is with respect to the offer of judgment and the

14  motion that you have made, which I think is for a monetary

15  award of some $46,000.

16       MR. SEGAL:  Okay.  Just those two directly.  We would

17  argue we would get an offset.

18       THE COURT:  It's a complete offset, right?

19       MR. SEGAL:  Yes.  And in essence, we would be

20  entitled to seek to move for judgment for the difference --

21       THE COURT:  That's the question I have.

22       MR. SEGAL:  I apologize.  Then that would be my

23  answer.  That we would get a complete offset.  The judgment

24  would be rendered satisfied and that my client could choose

25  whether they wish to convert the order for the difference into

1  a judgment, and seek to pursue that against Ms. Mahmood.

2        THE COURT:  That's the question I was asking.  Okay.

3        Mr. Smith, that being the case -- unless you hold a

4  different view of what the significance of granting that motion

5  is -- doesn't that moot your application to have the judgment

6  amount in favor of Ms. Mahmood made payable to your firm?

7        MR. SMITH:  Absolutely not, Judge.  Firstly, the

8  defendants did not include in their motion an application to

9  have a setoff against the verdict.  They have provided no

10  authority to the Court that allows you to do that.

11        We have provided in our motion authority that

12  suggests to the Court -- it gives you the authority that our

13  claim to be reimbursed costs from that verdict trump any

14  subsequent order they may get for costs under the offer for

15  judgment rule.

16        So, there is no authority they have cited that allows

17  you to setoff your order allowing them costs against the

18  verdict.

19        We have, again -- and our motion -- the case law goes

20  way back to the 1800's.  That the attorney's claim to be

21  reimbursed taxable costs takes precedent over any subsequent

22  claim the defendant may have against the verdict.

23        THE COURT:  Mr. Smith -- I'm sorry, Mr. Segal --

24        MR. SEGAL:  Yeah, I --

25        THE COURT:  -- on that subject, that is ultimately

6

1  the question I have as to the interplay between the judgment

2  amount, based on the verdict, you application based on the

3  offer of judgment rule, and Mr. Smith's firm's application, as

4  I say, the interplay of those three competing interests, how

5  that all nets out.

6          MR. SEGAL:   Well, I think it's, first, interesting

7  that Mr. Smith argues that we don't have any precedence.

8          First, I would take significant issue with the

9  precedence.   We made an offer of judgment pursuant to a federal

10  rule.   The federal rule specifically seeks to, if certain

11  things happen, you are entitled to certain things, number one.

12          Number two, the attorney lien that Mr. Smith speaks

13  of is specifically entitled "Lien for Services," and then

14  speaks to, "Shall have a lien for compensation."

15          Nowhere -- and I can read the entire thing if Your

16  Honor wishes -- but nowhere in it does it speak to costs.

17  Interesting, Mr. Smith isn't here saying, "Your Honor, I'm

18  entitled to my fee for handling the trial."   He's here saying,

19  "I'm entitled to my costs."

20          The retainer agreement specifically speaks

21  differently to costs and legal fees for work provided.

22          We argue, and it's our opinion, that the lien -- the

23  attorney lien is for services provided.   The same way a

24  mechanic has a mechanic's lien for work done.

25          I handle all trucking, just so -- if you can give me

1  a few minutes to give you an analogy.   We get towing matters.

2  A tractor trailer rolls over on the turnpike, gets towed in,

3  the trucking company gets an absurd tow bill.   While they're

4  fighting the tow bill, they want the goods so that it can get

5  to their customer.

6          I get involved.   The mechanic always -- the tow

7  company always says, "I have a mechanic's lien."   No, you have

8  a mechanic's lien for the work you did; you have no right to

9  the interstate commerce, the goods that you have in your

10  possession.   It's different.

11          Same thing here:   The attorneys' lien doesn't cover

12  costs.   I didn't see a case that Mr. Smith cites in any modern

13  day.   Notice the only cases he cites are all the way back when

14  equity -- I don't even -- I can -- I won't say for certain, but

15  I don't believe the attorney lien statute was in effect when

16  the cases Mr. Smith cited.   And interestingly, he, I guess,

17  couldn't find a case to specifically show Your Honor that the

18  lien cover costs and that costs trump an offer of judgment.

19          So, I think that there clearly is an interplay here.

20  I don't think Mr. Smith has anything that trumps.

21          And I think that what's interesting in this case is

22  the first argument I made.   If Your Honor believes there's an

23  offset, then ultimately there is no judgment rendered to Ms.

24  Mahmood from which Mr. Smith can apply his retainer agreement

25  arguing a --

8

1        THE COURT:  But there are no proceeds.

2        MR. SEGAL:  I apologize.

3        THE COURT:  Right?

4        MR. SEGAL:  Correct.  Because ultimately there will

5   be -- and I do think that there is a long line of cases that

6   speak to the offer of judgment rule and its purpose.  And to

7   turn around and to argue that costs -- plaintiff's costs

8   somehow trump defendants' cost when defendant put plaintiff on

9   notice that, "Here's what we're willing to give you to avoid

10  all of this."  And especially in this case where plaintiff

11  herself was put on the witness stand in the middle of trial and

12  explained the ramifications and said, "I understand and I

13  accept that possibility."

14        I don't understand how even under equity, which is

15  what those eighteen hundred year old -- the 1800's cases were

16  done under, it would be equitable for Mr. Smith's firm to get

17  costs, but for my client to bear all of its costs under the

18  scenario and the facts that went with the offer of judgment.

19        MR. SMITH:  Judge, if I may just respond.  I mean Mr.

20  Segal obviously didn't read the cases that we cited because

21  they clearly state -- even if they do back to the 1900's and

22  1800's, they're not disturbed, they haven't been overturned

23  because he's provided no case law to tell you that -- that

24  clearly the attorneys' costs are considered a lien that is not

25  entitled to be setoff against any defendant's application for

9

1  costs subsequently.

2          So, where is their authority that they're entitled to
3  a setoff?  I haven't seen it.

4          And I would indicate this, Your Honor:  They are not
5  left without a remedy, okay?  What Mr. Segal has just done is
6  argued his motion for costs under the offer for judgment rule,
7  which obviously wasn't opposed.

8          So -- but he's not without a remedy.  If -- Your
9  Honor granted that motion.  They can do whatever they need to.

10         I'm -- I'm entitled to get my costs and if there was
11 enough of the verdict, that I would be entitled to a fee under
12 my fee agreement, then I would make an application for that,
13 too.  But --

14         THE COURT:  Let's talk about your --

15         MR. SMITH:  He -- if I may, Judge.

16         THE COURT:  Go ahead.

17         MR. SMITH:  That is my only recourse to get
18 reimbursed is through that verdict.

19         I cannot subsequently -- pursuant to my agreement
20 with Ms. Mahmood, I cannot go after her individually or ask her
21 individually outside of the verdict to reimburse me those
22 costs.

23         THE COURT:  Well, let's talk about that.  That's
24 exactly the question I wanted to raise.  I have been looking
25 at the contingent fee agreement which is attached to your

10

1  moving papers and there's some handwritten language at the
2  bottom of the first page.  I assume that's what you're
3  referring to.

4          MR. SMITH:  Yes, Judge.  I'm going to represent to
5  you that is something I wrote in when I -- when Ms. Mahmood
6  retained me.  It is something that I pretty much standard offer
7  to my clients when I take on a case.  And it basically says
8  that I won't get reimbursed the costs if there's not a
9  recovery; there is a verdict in this case.

10         THE COURT:  So, the last word, which is what I was
11 having trouble reading, "Paid by a firm or on behalf of client,
12 reimburse the firm only upon return."?

13         MR. SMITH:  Return or recovery.

14         THE COURT:  Recovery, okay.  Thank you.

15         All right.  I understand the -- I understand the
16 argument.  I am concerned about this interplay of these three
17 competing interests over a -- over the judgment amount of the
18 verdict, and I'd like to take another look at the cases there,
19 and will do so.

20         I'm going to grant the motion, but I'm going to
21 reserve on Mr. Smith's motion until I have a chance to take
22 another look at -- on how that works out.

23         Let's move to the plaintiff's motion for a new trial.
24 I've read the papers.  Mr. Smith, it's your motion on behalf of
25 plaintiff, I'll hear you.

11

1          MR. SMITH:   Judge, I'm not going to -- I'm not going

2     to argue ad nauseam as to what we've already stated in our

3     moving papers.

4          Just to highlight a few points:   If Your Honor will

5     recall what was -- what was not disputed in front of this jury

6     was that this plaintiff, Sania Mahmood, suffered -- and that's

7     the word that's important -- suffered injuries as a result of

8     the conceded motor vehicle accident due to the defendant's

9     negligence.

10         Defendants' own witnesses, their doctors all conceded

11    that she suffered injuries.   They disagreed amongst each other

12    as to how long she suffered from those injuries that were

13    related to the accident.   But they all agreed she suffered

14    injuries.

15         And if you'll recall, she had multiple parts of her

16    body that were injured:   her cervical spine, her lumbar spine,

17    her shoulder, her knee, and her emotional and psychiatric state

18    was also significantly affected.

19         There's no dispute that she needed treatment and

20    received medical treatment for the injuries that I've described

21    to you.

22         The only dispute that came in this trial had to do

23    with the causal relationship of the lumbar fusion and its

24    relationship to the date of the accident.

25         However, that lumbar fusion didn't come for almost

12

1  two years after the accident.  This woman went through at least

2  -- at least two years of undisputed pain and suffering and

3  medical treatment.

4          The jury's verdict was grossly inadequate to

5  compensate her, at the very least, for the pain and suffering

6  she went through for the undisputed injuries that we presented

7  to the jury.

8          She underwent -- took pain medications, narcotics,

9  which she didn't do before.  She went -- underwent injections,

10  epidural injections, facette fluoroscopy or S.I. injections,

11  which are done under anaesthesia.  The defendants' own experts

12  agreed, their doctors agreed in front of the jury, those are

13  risky procedures, they're done under anesthesia.  They're done

14  to help -- try and help alleviate pain.  So, they're not done

15  to someone who doesn't have any symptomatology or pain.

16          They never said that those procedures weren't

17  necessary nor related to the accident.  The only dispute they

18  tried to raise -- or they raised to the jury was the extent of

19  the injuries as a result of this accident.

20          Dr. Bills had one version as to when he thought the

21  strains and sprains, as he called them, healed.  Although he

22  never really commented on the knee or the shoulder.

23          Dr. -- the other two doctors likewise had different

24  versions.  That they had healed, but they never said when.

25          But they all agreed she suffered injury.  And the

13

1  award of damages for four major body parts is grossly

2  inadequate.  I mean I know from doing this work for 25 years,

3  that award -- that verdict, Judge, was for a simple strain to a

4  back or perhaps a neck.

5          So, clearly it was inadequate and the offer for

6  judgment was still -- and as far as I know -- was never

7  withdrawn.  Never withdrawn, as far as I know.  But at the very

8  least, at the end of plaintiff's case, it was still being

9  offered and that was ten times the amount of the jury verdict.

10          So, clearly the jury's verdict being grossly

11  inadequate for the damages and injuries and suffering that this

12  woman went through.  It's not fair.  She was not compensated

13  fairly for the evidence that was presented.

14          And based upon that, I think she is entitled to a new

15  trial.

16          THE COURT:  Mr. Segal?

17          MR. SEGAL:  Yes, Your Honor.  I'm going to work

18  backwards.

19          First, the offer of judgment by rule is withdrawn

20  once not accepted.

21          As a matter of fact, I believe that issue came up

22  during trial, and I made it clear on the record that it was

23  withdrawn by statute.  And at least I, through counsel, never

24  made an offer to settle this case during trial.  There were

25  certainly discussions that were pursued, but as far as I am

14

1 concerned, I never made an offer of any amount of money during
2 trial to Mr. Smith to settle the case for any amount. And that
3 the offer of judgment I made was clearly withdrawn. My client
4 would entertain settlement discussions, but that I was not
5 offering any amount of money, number one.

6 And number two: Mr. Smith says how plaintiffs didn't
7 prove, plaintiffs didn't prove, plaintiffs didn't prove;
8 plaintiff has the burden of proof.

9 First of all, defendants, especially myself, never
10 used the word "suffered." I was taught as a young lawyer, we
11 used the word "sustained." You sustain injury, you don't
12 suffer injury.

13 And I believe that with all due respect to Mr. Smith,
14 we must have sat through a different trial because I thought
15 the defendants made it clear that the position was that Ms.
16 Mahmood sustained nothing more than soft tissue type injuries
17 that had resolved. And that everything else she incurred would
18 have incurred but for her accident in light of the fact that
19 all of those complaints existed -- I forget the date of
20 meeting, I think it was a week before our accident. And that
21 was shown by documents, shown by her admission, was shown by
22 all the doctors, probably more than I should have, going
23 through each and all of those records that people didn't see or
24 know of, but the jury got to see, showing that all of Ms.
25 Mahmood's complaints that she alleged were as a result of the

15

1  accident with the defendant preexisted the accident with the

2  defendant and had been related to an accident only six months

3  before.

4         I would agree with Mr. Smith the jury verdict was a

5  verdict for strains and sprains, soft tissue type injuries.

6  And we believe that that is completely in accordance with the

7  defendant's position.

8         I don't think defendants ever admitted anything

9  except that she sustained some injury.  I believe those were

10  the words I used.

11        We believed that ultimately -- I believe in my

12  closing I said that we proved to you that the injuries she

13  sustained were nothing more than soft tissue that resolved, and

14  that we ask you to render a verdict fair for that.

15        Now the mere fact the defendants chose to accept

16  defendant's side of the case, that's why juries are scary.

17  That's why lawyers don't always like to leave a case to a jury.

18  But I think we were down to -- if Your Honor will help me --

19  seven, correct?  We had seven individual minds in only 35

20  minutes after being here for an entire five days, came together

21  with a number.  It was unanimous, we required that.  And we

22  think that it was ultimately fair based upon the position the

23  defendants took in the case.

24        THE COURT:  Thank you.  Mr. Smith, do you want to add

25  something?

16

1           MR. SMITH:  Yes, Judge.  I do need to respond to

2  something Mr. Segal said.  While he may be correct that the

3  offer for judgment may have expired under the rule because it

4  wasn't accepted, I specifically on the record asked him to

5  acknowledge that the offer was still on the table.  Whether it

6  was an offer for judgment or not, it was $250,000 was -- is

7  available to settle the case, that's the reason we put Ms.

8  Mahmood up on the witness stand.

9           THE COURT:  And she made clear that she was

10  uninterested at that level, or any -- any level near that

11  amount.

12           MR. SMITH:  I understand that.  But it was clearly an

13  offer that was still available, at least as of the date that we

14  put her up on the witness stand.

15           THE COURT:  Is this really an issue that we need to

16  debate?  Because -- I understand your point as it relates to

17  this motion, Mr. Smith, which is you're arguing that the

18  defendants themselves perceived a value of this case which was

19  in excess of the jury's verdict.

20           MR. SMITH:  We --

21           THE COURT:  The semantics of whether there was an

22  offer made or a willingness to entertain a demand close to the

23  prior offers that had been made, I think, is immaterial to your

24  argument, but I understand your argument.

25           MR. SMITH:  Well, I just wanted to make that clear

1  for the record.

2         But you raised a good point, Judge: I think we all

3  agree that the value of the case was much greater than $25,000,

4  that this jury came up with verdict --

5         THE COURT:  Well, that wasn't the point I was making.

6  The point I -- I was acknowledging your argument that the

7  defendants --

8         MR. SMITH:  Well, I'm --

9         THE COURT:  Your argument is that the defendants

10 perceived a value of this case greater than the amount of the

11 jury's verdict at some point.  Their perception of value may

12 have changed over the course of the trial.

13        MR. SEGAL:  I only made one comment.

14        MR. SMITH:  Can I finish?

15        MR. SEGAL:  I'm not going to get into a battle back

16 and forth on that, but I will say this:  Just so everybody's

17 clear on the record, the offer of judgment, the value the

18 defendants put on the case was what we believed the jury could

19 have returned had they bought the surgery.

20        THE COURT:  Right.

21        MR. SEGAL:  Not had they not bought the surgery,

22 which is what our position was.

23        So, regardless of what -- whether -- I will stand by

24 my initial statement, but I'm not going to argue that.  But I

25 just want the argument you made that that was our evaluation of

18

1  our worst end.  That if the jury bought the surgery, here's

2  what we thought the surgery was worth, here's what we were

3  willing to pay up-front.

4          That had nothing to do with what we believed the case

5  was worth as trial unraveled.

6          MR. SMITH:  May I continue, Judge?  I thought it was

7  my turn.

8          THE COURT:  Yes.

9          MR. SMITH:  First of all, my feeling on that was if

10  the jury bought the surgery, the case was worth more than the

11  $250,000.

12          So, of course, we are going to have different

13  positions and opinions on the value of the case, but we at

14  least thought it was worth 250,000.  And this jury's verdict

15  was grossly inadequate and out of this world.

16          Secondly, Judge --

17          THE COURT:  Well, I understand your argument, but go

18  ahead.

19          MR. SMITH:  May I also add, Judge, that as I raised

20  to you, and we had a phone conference on this, there seems to

21  be some inappropriate considerations this jury may have had, at

22  least raises a question of impropriety that somebody thought

23  about the offer for judgment rule, and we don't know when they

24  knew about it, or thought about it, but clearly this jury had

25  some other considerations other than the evidence that was

19

1 presented to them, and that's not proper.

2         THE COURT: Do you want to be heard on the jury --

3         MR. SEGAL: Just that one issue: First, my

4 understanding was -- I know that Nancy Monte Carlo, my

5 associate, covered it. There was discussion on the record

6 about this with Your Honor, Your Honor made a ruling on that

7 issue; I don't think plaintiff gets a second bite of that

8 apple.

9         And I think it's clear that regardless of what one

10 juror heard, what is clear also is that they had no idea what

11 the amount was. So, there would be no way for them to know

12 whether they were picking or rendering a verdict under whatever

13 that mystery number was.

14         And, again, this is seven people who unanimously came

15 to a decision in a very quick period of time. We believe it

16 was based upon the evidence they heard. It fits with

17 defendants' position and has nothing to do with anything that

18 came up afterwards.

19         MR. SMITH: Judge, if I -- you just -- if I may.

20 Your ruling at the time of the phone conference was that it

21 wouldn't be investigated further. But if I wanted to make a

22 further point of it, I needed to do it by formal application.

23 So, I included it in this -- in this motion.

24         THE COURT: I understand.

25         MR. SMITH: Thank you.

1          THE COURT:   Rule 59 of the Federal Rules authorizes

2   the Court to grant a new trial to prevent injustice or correct

3   a verdict that is contrary to the weight of the evidence.

4          I determine here that the jury's verdict was not

5   contrary to the weight of the evidence.   I've reviewed the

6   <u>Williamson versus Rail Corp</u> case at 926 F.2d 1344, it's a Third

7   Circuit case, 1991.   I find that to be analogous, "New trials

8   because the verdict is against the weight of the evidence are

9   proper only when the record shows that the jury's verdict

10  resulted in a miscarriage of justice or where the verdict, on

11  the record, cries out to be overturned or shocks our

12  conscience."

13         As both counsel have argued, as argued in their

14  openings, Ms. Mahmood sustained injuries in the June, 2007

15  motor vehicle accident.   The question presented to the jury was

16  what was the nature and extent of those injuries.   And of all

17  of the injuries claimed, which were causally related to the

18  accident which is the subject of the trial.

19         There was expert testimony presented on both sides of

20  that issue.   Certainly the jury was entitled to and had ample

21  opportunity to judge the credibility of Ms. Mahmood's

22  statements based upon her own testimony and her actions

23  throughout the trial.   And in my judgment, that played a

24  considerable role in the jury's determination.

25         I cannot say that this verdict was against the weight

1 of the evidence such that the outcome here cries out to be

2 overturned as a miscarriage of justice.

3       With respect to the issue of the inquiry from one of

4 the jurors to defense counsel, I did address that in a

5 telephone conference on the record.  I said then, and I repeat

6 now, and I remain satisfied that that call in and of itself

7 does not give rise to any inference of any impropriety on the

8 part of the jury.  There's no evidence by that call or by any

9 subsequent occurrence that the juror who made the inquiry to

10 Mr. Segal's office had any understanding of the term of art,

11 "offer of judgment," what it meant, let alone that there had

12 been an offer of judgment in this case, or that -- the amount

13 of that offer of judgment.

14       And there's no evidence that there was any

15 consideration of that in the jury's deliberations.

16       So, on the bases of the two arguments advanced by the

17 plaintiff for a new trial in this matter, I'm going to deny the

18 motion.

19       That leaves finally the motion by Mr. Smith's office

20 to be relieved as counsel.

21       Mr. Smith, I've read the papers that you've

22 submitted.  I assume, although you may have submitted a

23 certification to this effect, that those papers were served on

24 Ms. Mahmood in advance of today's hearing, correct?

25       MR. SMITH:  That's correct, Judge.

22

1          THE COURT:  And I've received no opposition to that
2   application from Ms. Mahmood.  Have you?
3          MR. SMITH:  I have not, Judge.
4          THE COURT:  Ms. Mahmood, you're present here today.
5   You have received the application by the Pellettieri, Rabstein
6   & Altman firm to be relieved as your attorneys in this matter.
7          MS. MAHMOOD:  Yes, Your Honor.
8          THE COURT:  Any opposition to that application?
9          MS. MAHMOOD:  No, Your Honor.
10          THE COURT:  All right.  Well, I'm inclined to grant
11   that application.  And once I have resolved the opening issue
12   of the day, which was the application of the offer of judgment
13   rule versus the application by Mr. Smith's office for
14   reimbursement of his firm's costs, I'll sign an order relieving
15   the firm and that will -- that will resolve all of the
16   applications that I have before me today, I believe.  Correct,
17   Mr. Smith?
18          MR. SMITH:  That's all plaintiffs would have, Judge.
19          THE COURT:  Mr. Segal?
20          MR. SEGAL:  Your Honor, I don't know if you're not
21   considering an application or if you're waiting on the
22   transcript request by Ms. Mahmood herself for a free copy.  I
23   didn't know if you were waiting to see if they would be
24   relieved as counsel and, therefore, her financial status.
25          THE COURT:  I don't think -- I'm not going to -- I'm

23

1  not going to address her -- Ms. Mahmood's request for a

2  transcript at this juncture.  I'll deal with that -- it will be

3  determined after the firm is relieved.

4           MR. SEGAL:  That's what I thought, but -- so that one

5  would hang out there after your determination.

6           THE COURT:  Yes.  All right.  Anything else?

7           MR. SEGAL:  Nothing, Your Honor.

8           THE COURT:  All right.  Nice to see you again, folks.

9           MR. SEGAL:  Same here, Your Honor.

10          MR. SMITH:  Thank you, Judge.

11          MR. SEGAL:  Thank you.

12

13          (Whereupon, at 9:56 A.M., the hearing was adjourned.)

14

15

16                    CERTIFICATE OF TRANSCRIBER

17

18       I, KAREN HARTMANN, a certified Electronic Court

19  Transcriber, certify that the foregoing is a correct transcript

20  from the electronic sound recording of the proceedings in the

21  above-entitled matter.

22

23

24   /s/ *Karen Hartmann*    AAERT CET**D0475 Date:  February 8, 2013

25  TRANSCRIPTS PLUS, INC.

TRANSCRIPTS PLUS, INC.
PHONE 215-862-1115 ● FAX 215-862-6639 ● E-MAIL CourtTranscripts@aol.com

**Westlaw Delivery Summary Report for WOLF, AMANDA F**

| | |
|---|---|
| Date/Time of Request: | Wednesday, March 27, 2013 14:59 Central |
| Client Identifier: | WOLF AMANDA |
| Database: | FEDFIND |
| Citation Text: | 135 Fed.Appx. 538 |
| Lines: | 256 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

FOR EDUCATIONAL USE ONLY
Page 1

135 Fed.Appx. 538, 2005 WL 1463208 (C.A.3 (N.J.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 135 Fed.Appx. 538, 2005 WL 1463208 (C.A.3 (N.J.)))

**C**

This case was not selected for publication in the
Federal Reporter.

Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Third Circuit LAR,
App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)

United States Court of Appeals,
Third Circuit.
Arthur PERRYMAN, Jr., Appellant,
v.
H & R TRUCKING, INC., and/or; H & R Trucking
Co., and/or; H & R Trucking Company of North-
field, Inc., and/or; H & R Trucking Co. of North-
field, LLC; John Doe Owner, # 1-5; John Doe
Company, # 1-5; John Doe Inc., # 1-5; Ryder Truck
Rental, Inc.; John Doe Owner, # 6-10; John Doe
Company # 6-10; John Doe Inc., # 6-10; Jeffrey V.
Miller; John Doe 1-5; Richard Roe 1-10; Richard
Roe Company 1-10; Richard Roe Inc., 1-10 jointly,
severally and/or in the alternative.

No. 03-4806.
Submitted Under Third Circuit LAR 34.1(a) June 9,
2005.
Decided June 22, 2005.

**Background:** Accident victim brought suit against
truck driver, owner and others to recover for per-
sonal injuries sustained when his tractor-trailer was
struck by another tractor-trailer. The United States
District Court for the District of New Jersey, Freda
L. Wolfson, J., entered judgment on jury verdict in
accident victim's favor, assessing comparative re-
sponsibility at 60% for other driver and 40% for ac-
cident victim. Accident victim appealed.

**Holdings:** The Court of Appeals, Ambro, Circuit
Judge, held that:
(1) errant reference to victim's entire medical re-
cord in closing was harmless;

(2) allowing impeachment of driver with only fact
of his conviction without disclosure of nature of of-
fense was not abuse of discretion;
(3) admitting photographs of vehicles as more pro-
bative than prejudicial was not abuse of discretion;
and
(4) court could refuse to award post-trial relief or
sanctions on basis of perjury that was exposed dur-
ing trial.

Affirmed.

West Headnotes

**[1] Federal Civil Procedure 170A ⟜2332**

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(B) Grounds
      170Ak2332 k. Misconduct of Parties,
Counsel or Witnesses. Most Cited Cases
    District court acted within its discretion in de-
termining that counsel's errant implication as to ex-
tent of plaintiff's medical history during closing ar-
gument in accident case, when counsel physically
held up voluminous appendix of plaintiff's medical
records that had been admitted into evidence only
part, was harmless and did not warrant new trial, as
argument did not produce reasonable probability of
improper influence in light of pre-existing medical
conditions that were properly admitted.

**[2] Witnesses 410 ⟜336**

410 Witnesses
  410IV Credibility and Impeachment
    410IV(B) Character and Conduct of Witness
      410k334 Witnesses Who May Be Im-
peached as to Character
      410k336 k. Party as Witness in Civil
Action or Proceeding. Most Cited Cases
    District court did not abuse its discretion in al-
lowing impeachment of defendant in motor vehicle
accident case with fact of his conviction of a crime
resulting in imprisonment of one year without al-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

135 Fed.Appx. 538, 2005 WL 1463208 (C.A.3 (N.J.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 135 Fed.Appx. 538, 2005 WL 1463208 (C.A.3 (N.J.)))

lowing disclosure of nature of offense, on basis that prejudicial nature of disclosure that offense was sexual assault would have outweighed its probative value. Fed.Rules Evid.Rule 609(a)(1), 28 U.S.C.A.

**[3] Evidence 157 ☞359(1)**

157 Evidence
   157X Documentary Evidence
      157X(C) Private Writings and Publications
         157k359 Photographs and Other Pictures; Sound Records and Pictures
         157k359(1) k. Photographs in General. Most Cited Cases

Probative value of photographs demonstrating that vehicles involved in accident sustained little or no physical damage on issue of extent and cause of alleged personal injuries was not substantially outweighed by danger of unfair prejudice arising from risk that jury might not appreciate extent of personal injuries that could result in absence of physical damage to vehicles. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**[4] Evidence 157 ☞359(1)**

157 Evidence
   157X Documentary Evidence
      157X(C) Private Writings and Publications
         157k359 Photographs and Other Pictures; Sound Records and Pictures
         157k359(1) k. Photographs in General. Most Cited Cases

Jury's deliberative processes, as influenced by photographic evidence, could not be equated with opinion testimony by layperson, so as to invoke strictures of rule governing layperson opinion evidence in introduction of photographs in accident case that showed little or no physical damage to vehicles. Fed.Rules Evid.Rule 701, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☞2654**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(G) Relief from Judgment

         170Ak2651 Grounds
            170Ak2654 k. Fraud; Perjury. Most Cited Cases

**Federal Civil Procedure 170A ☞2791**

170A Federal Civil Procedure
   170AXX Sanctions
      170AXX(B) Grounds for Imposition
         170Ak2791 k. Misrepresentation or Omission of Facts. Most Cited Cases

Plaintiff was not prejudiced in personal injury suit when it was revealed in open court that defendant had lied in order to conceal fact that he had been incarcerated, so as to permit post-trial relief and sanctions on ground of "fraud against court," where plaintiff was allowed to impeach defendant by admitting evidence of prior conviction and incarceration.

**\*540** Appeal from the United States District Court for the District of New Jersey. (D.C. Civil Action No. 01-cv-05860). District Judge: Honorable Freda L. Wolfson.

Before AMBRO, VAN ANTWERPEN and TASHIMA,[FN*] Circuit Judges.

> FN* Honorable A. Wallace Tashima, Senior United States Circuit Judge for the Ninth Circuit Court of Appeals, sitting by designation.

**OPINION**
AMBRO, Circuit Judge.

  **\*\*1** Appellant Arthur Perryman filed an action in the District Court for injuries sustained when his tractor-trailer allegedly was struck by another tractor-trailer driven by Jeffrey Miller, an employee of H & R Trucking, Inc. After a trial, the jury assessed comparative responsibility for the accident at 60% for Miller and 40% for Perryman and determined a gross damages award of $39,000 in Perryman's favor. Dissatisfied with this result, Perryman sought a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

135 Fed.Appx. 538, 2005 WL 1463208 (C.A.3 (N.J.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 135 Fed.Appx. 538, 2005 WL 1463208 (C.A.3 (N.J.)))

new trial on the basis of, *inter alia,* several alleged erroneous evidentiary rulings. The District Court denied this motion and Perryman timely appealed. For the reasons described below, we reject each of Perryman's contentions and affirm the judgment of the District Court.[FN1] Because we write solely for the parties, we do not recite the facts underlying this appeal.

> FN1. We have jurisdiction to review the District Court's final order pursuant to 28 U.S.C. § 1291.

### I.

[1] Perryman first argues that Miller's counsel improperly influenced the verdict by referring in closing argument to evidence not before the jury. Specifically, Perryman alleges that Miller's counsel held up a voluminous appendix of Perryman's medical records that had been admitted into evidence only in part. Perryman does not dispute that the most relevant portions of that medical history were properly introduced at trial. His objection is confined to the jury's exposure to the volume (and, by implication, extent) of his medical history. This timely objection was rejected by the District Court at trial.

" 'The remarks of counsel [are] required to be confined to the evidence admitted in the case.... Reversible error is committed when counsel's closing argument to the jury introduces extraneous matter that has a reasonable probability of influencing the verdict.' " *Reed v. Philadelphia, Bethlehem & New England R.R. Co.,* 939 F.2d 128, 133-34 (3d Cir.1991) (quoting *Ayoub v. Spencer,* 550 F.2d 164, 170 (3d Cir.), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977)). "In matters of trial procedure such as that involved here, the trial judge is entrusted with wide discretion because he is in a far better position than we to appraise the effect of the improper argument of counsel." *Id.* at 133.

In this case, we easily conclude that the District Court acted well within its discretion when it determined that counsel's physical reference to the ap-

pendix did not produce a reasonable probability of improper influence. In light of the evidence of pre-existing medical conditions that was properly admitted, we agree with the District Court that counsel's errant implication concerning the extent of Perryman's medical history was harmless and does not warrant a new trial.

### *541 II.

[2] Perryman next contends that the District Court incorrectly applied Fed.R.Evid. 609(a)(1) when it determined that the prejudicial effect of admitting evidence as to the nature of Miller's prior crime outweighed its potential probative value.[FN2] Rule 609(a)(1) provides that, for the purposes of attacking the credibility of a witness, evidence of the witness' conviction of a crime punishable by one or more years in prison is admitted if the court determines that the probative value of admitting the evidence outweighs its prejudicial effect. *See, e.g., Johnson,* 388 F.3d at 100. Miller was convicted of sexual assault, a crime punishable by more than one year of imprisonment. The District Court concluded that admitting evidence of Miller's criminal conviction would yield a net probative effect so long as the specific nature of the crime committed was not disclosed to the jury.

> FN2. With regard to Perryman's remaining arguments, we review the District Court's decision whether to admit evidence for abuse of discretion, but exercise plenary review over its construction of the Federal Rules of Evidence. *United States v. Johnson,* 388 F.3d 96, 100 (3d Cir.2004).

**2 We are not swayed by Perryman's position that the District Court erred by denying him the opportunity to inform the jury that Miller had been convicted of sexual assault. Perryman stresses the importance of each witness' credibility in his case. Likewise, the District Court properly considered the importance of meaningful credibility assessments to an informed jury verdict in this case, weighing that interest against the extremely prejudicial effect that would be caused by the jury's knowledge of a prior

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

135 Fed.Appx. 538, 2005 WL 1463208 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 135 Fed.Appx. 538, 2005 WL 1463208 (C.A.3 (N.J.)))**

sexual assault conviction. The District Court concluded that admission of less prejudicial evidence-namely, the fact of Miller's conviction of a crime and resulting imprisonment without further detail-would balance these conflicting interests. App. at 472.

We endorse the District Judge's careful approach. Cf. Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (mandating similar approach under Rule 404 in a prosecution for a crime that includes felony-convict status as an element, and explaining that in certain circumstances the admission of evidence pertaining to the name or nature of a conviction runs afoul of a Rule 403 prejudice balancing). The District Court properly construed Rule 609 and acted well within the discretion that Rule confers.

### III.

[3] Perryman next objects to the introduction of photographs depicting the tractor-trailers involved in the accident. Specifically, he argues that, because the photographs did not reveal any damage to the vehicles and because the jury lacked the expertise required to assess the extent of personal injuries that might have been caused in spite of the absence of physical damage to the vehicles, the admission of the photographs was so prejudicial as to be an abuse of the District Court's discretion. To be clear, Perryman asks us to conclude that the District Court abused its discretion by admitting into evidence photographs of the actual vehicles involved in the accident that gave rise to this dispute-his lawsuit for damages arising from the accident.

Rule 403 codifies the evidentiary principle that the probative value and prejudicial effect of offered evidence must be weighed in determining its admissibility. Under this rule, evidence is excluded only if its prejudicial effect substantially outweighs *542 its probative value.[FN3] See, e.g., United States v. Universal Rehabilitation Services (PA), Inc., 205 F.3d 657, 664-65 (3d Cir.2000). We have explained that the rule implements a presumption in favor of admissibility. Id.

FN3. We emphasize yet again that, because of his presence in the courtroom, "[t]he trial judge, not the appellate judge, is in the best position to assess the extent of the prejudice caused a party by a piece of evidence." United States v. Long, 574 F.2d 761, 767 (3d Cir.1978).

Perryman's contention that the District Court failed to adhere to Rule 403 by admitting the photographs is far off the mark. Surely photographs demonstrating that the vehicles involved in the accident sustained no physical damage are highly probative in a case in which, as here, the parties dispute the extent and cause of alleged personal injuries. Nor is it clear how Perryman was prejudiced by their introduction unless he is erroneously asserting some right to keep from the jury details of the very accident that spawned his suit. Far from finding an abuse of discretion by the District Court, we wonder if the Court could have defensibly ruled otherwise.

**3 [4] Perryman also argues that Fed.R.Evid. 701 prohibited the District Court from allowing the photographs to be introduced. Rule 701, entitled "Opinion Testimony by Lay Witnesses," applies when a "witness is not testifying as an expert." We fail to see how this rule governing testimonial evidence of a layperson's opinion bears any relevance to the District Court's decision to admit photographic evidence. Unfortunately, Perryman's brief offers little insight to this end. It seems to equate the jury's deliberative process-as influenced by the photographic evidence-with opinion testimony by a non-expert witness and argues that Rule 701 confines not only the scope of admissible testimony in this context but also, by extension, the type of questions that can properly be left to the jury to answer. While this metaphorical reasoning is theoretically interesting, we discern no basis to adopt it. We thus find no error in the District Court's admission of the photographs.

### IV.

[5] Perryman next asserts that the Court erred

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

135 Fed.Appx. 538, 2005 WL 1463208 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 135 Fed.Appx. 538, 2005 WL 1463208 (C.A.3 (N.J.)))**

by denying his motion for post-trial relief and sanctions on the ground of his "fraud against the court" theory. This fraud is alleged to have occurred when Miller perjured himself before the jury. Perryman argues that the District Court should have granted him a new trial and imposed sanctions against Miller when it was revealed in open court that Miller had lied in order to conceal the fact that he had been incarcerated. As explained by the District Court, it allowed Perryman to impeach Miller by admitting evidence of his prior conviction and incarceration. [FN4] App. at 872. Perryman nonetheless asserts that he was prejudiced by Miller's exposed perjury. The District Court considered and rejected this argument. For the reasons it expressed, we do the same.

> FN4. The District Court further concluded that, although the jury heard evidence of the perjury, it did not appear to assign significant value to it. App. at 876.

We also conclude that there is no basis upon which to support Perryman's argument that the District Court abused its discretion by denying his motion for sanctions under Fed.R.Civ.P. 37(c)(1).

#### *543 V.

For the reasons stated, we affirm the judgment of the District Court.

C.A.3 (N.J.),2005.
Perryman v. H & R Trucking, inc.
135 Fed.Appx. 538, 2005 WL 1463208 (C.A.3 (N.J.))

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.