### In The
# United States Court of Appeals for the Third Circuit



## 12-4207

SANIA MAHMOOD,

*Plaintiff-Appellant,*

v.

JOSEPH NARCISO;MAYFLOWER TRANS INC;
ABC CORPORATION (1-100), said names being fictitious;
VANTAGE BLUE; XYZ CORPORATION (1-100), said names being
fictitious; JOHN DOES (1-100), said names being fictitious,

*Defendant-Appellant.*

*Appeal from the Order dated October 5, 2012 in the United States
District Court for the District of New Jersey at No. 09-cv-02656.*

## BRIEF AND APPENDIX FOR PLAINTIFF-APPELLANT
### Volume I (pages 1a-17a)

RANDOLPH H. WOLF, ESQ.
KATHERINE A. NORTH, ESQ.
*Attorneys for Defendant-Appellant*

214 Broad Street
P.O. Box 8938
Red Bank, NJ 07701
(732) 741-4448

# TABLE OF CONTENTS

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

SUBJECT MATTER & APPELLATE JURISDICTION. . . . . . . . . . . . . . . . . . . . 1

ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

RELATED CASES AND PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    POINT I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE COURT BELOW ERRED BY EXCLUDING EVI-
DENCE RELATING TO THE FORCE OF IMPACT AND
THE CIRCUMSTANCES SURROUNDING THE AUTO-
MOBILE COLLISION. THE COURT'S DECISION TO
EXCLUDE THIS EVIDENCE WAS BASED ON ITS
ERRONEOUS CONCLUSION THAT IT WAS NO LON-
GER RELEVANT IN LIGHT OF THE FACT THAT THE
DEFENDANTS HAD STIPULATED AS TO LIABILITY.
THE EVIDENCE, HOWEVER, WAS DIRECTLY RELE-
VANT TO THE DISPUTED ISSUE OF THE PLAIN-
TIFF'S INJURIES. AS SUCH, THIS COURT MUST
GRANT A NEW TRIAL ON THE ISSUE OF DAMAGES.

A.    New Jersey Law Regarding Admission of
      Evidence Applies to this Action. . . . . . . . . . . . . . . . . . . . . . . . 8

B.   Even if Federal Law Applies, Evidence Re-
garding the Force of Impact and the Nature of
the Accident was Admissible as it Related to
Plaintiff's Physical and Psychological Inju-
ries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

POINT II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

THE TRIAL COURT ABUSED ITS DISCRETION
WHEN IT PREMATURELY EXCLUDED PORTIONS
OF THE EXPERT TESTIMONY OF CARY SKOLNICK,
M.D. THE EVIDENTIARY RECORD WAS INSUFFI-
CIENT TO ALLOW THE COURT BELOW TO EX-
CLUDE DR. SKOLNICK'S OPINIONS ON THE BASIS
THAT     THEY   WERE   NOT   ADEQUATELY
EXPLAINED. MOREOVER, DR. SKOLNICK'S OPIN-
IONS DID HAVE AN ADEQUATE BASIS. AS SUCH,
THIS COURT MUST GRANT A NEW TRIAL ON THE
ISSUE OF DAMAGES.

POINT III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

THE COURT BELOW ERRED BY DENYING PLAIN-
TIFF'S MOTION FOR A NEW TRIAL. THE JURY'S
VERDICT WAS SHOCKINGLY DISPROPORTIONATE
TO THE INJURIES.   SUSTAINING THE AWARD
WOULD BE MANIFESTLY UNJUST.

POINT IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

THE COURT BELOW ERRED BY DENYING PLAIN-
TIFF'S MOTION FOR A NEW TRIAL. UNCONTRA-
DICTED EVIDENCE ESTABLISHED THAT THE JURY
IMPROPERLY CONSIDERED INFORMATION RE-
GARDING DEFENDANT'S OFFER OF JUDGMENT.
AS IT HAS NOT BEEN SHOWN THAT THE JURY'S
DELIBERATIONS OR VERDICT WERE ENTIRELY

DEVOID OF THE PROBABILITY OF INDUE INFLU-
ENCE, THE VERDICT MUST BE SET ASIDE.

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

# **TABLE OF CITATIONS**

## <u>CASES</u>

*Baltus v. Von Der Lippe,* 196 N.W.2d 922 (Minn. 1972)................... 13

*Bishop v. Dale Jessup, Inc., et al.,* No. 4:05CV397, 2006 WL 571979
    (E.D.Mo. March 8, 2006)....................................... 16

*Brenman v. Demello,* 191 N.J. 18 (2007)........................... 9, 17

*Buckelew v. Grossbard,* 87 N.J. 512, 435 A.2d 1150 (1981)................ 22

*Cancio v. White,* 697 N.E.2d 749 (Ill.App.1998)...................... 17

*Daubert v. Merrrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786
    (1993)................................................. 20-22

*Davis v. Maute,* 770 A.2d 36 (Del. 2001)........................ 14, 17

*EEOC v. Delaware Dep't of Health and Social Services,* 865 F.2d 1408 (3d
    Cir. 1989).............................................. 31

*Elcock v. Kmart Corp.,* 233 F.3d 734 (3d Cir. 2000)..................... 21

*Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938)...................... 8

*Eskin v. Carden,* 842 A.2d 1222 (Del. 2004)....................... 16

*Farese v. United States of America,* 428 F.2d 178 (5th Cir. 1970)........... 38

*Farese v. United States,* 428 F.2d 178 (5th Cir. 1970)................... 39

*Feldman v. Allstate Insurance Co., et al.,* 322 F.3d 660 (9th Cir. 2003)......... 8

*Fuentes v. Tucker,* 187 P.2d 752 (Cal. 1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gambrell v. Zengel,* 110 N.J. Super. 377 (App. Div. 1970). . . . . . . . . . . . . . . . . 10

*General Electric v. Joiner,* 522 U.S. 136 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gibson v. Mayor & Council of Wilmington,* 355 F.3d 215 (3d Cir. 2004). . . . . . . . 2

*Government of Virgin Islands v. Gereau,* 523 F.2d 140 (3d Cir. 1975), *cert. denied,* 424 U.S. 917 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Greenleaf v. Garlock, Inc.,* 174 F.3d 352 (3d Cir.1999). . . . . . . . . . . . . . . . . . . 32

*Hines v. Consolidated Rail Corp.,* 926 F.2d 262 (3d Cir. 1991). . . . . . . . . . . . . . 22

*Hines v. Consolidated Rail Corporation v. General Electric Co.,* 926 F.2d 262 (3d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Holman Enterprises v. Fid. & Guar. Ins.* Co., 563 F.Supp.2d 467 (D.N.J.2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Howard v. Stoughton,* 433 P.2d 567 (Kan. 1967). . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hurley v. Atl. City Police Dept.,* 174 F.3d 95 (3d Cir.1999). . . . . . . . . . . . . . . . . 3

*In Re Beverly Hills Fire Litigation,* 695 F.2d 207 (6th Cir. 1983). . . . . . . . . . . . . 39

*In re Japanese Electric Prods Antitrust Litig.,* 723 F.2d 238 (3d Cir. 1983). . . . . 25

*In Re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir. 2000). . . . . . . . . . . . 21, 25

*Kinney v. Smith,* 508 P.2d 1234 (Idaho 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Klein v. Hollings,* 992 F.2d 1285 (3d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Klein v. Hollings,* 992 F.2d 1285 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Marron v. Stromstad,* 123 P.3d 992 (Alaska 2005). . . . . . . . . . . . . . . . . . . . . . . . 16

*Martinez v. Food City, Inc.,* 658 F.2d 369 (5th Cir. 1981). . . . . . . . . . . . . . . . . . . 20

*Mason, v. Lynch,* 822 A.2d 1281 (Md. 2003). . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*McDonald v. Pless,* 238 U.S. 264 (1915). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Millay v. Milwaukee Auto. Mut. Ins. Co.,* 120 N.W.2d 103 (Wis. 1963). . . . . . . . 14

*Murray v. Marina District Development Co.,* 311 Fed. Appx. 521, 2008 WL
2265300 (3d Cir. June 4, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Oddi v. Ford Motor Co.,* 234 F.3d 136 (3d Cir. 2000). . . . . . . . . . . . . . . . 20, 23-25

*Padillas v. Storck-Gamco, Inc.,* 186 F.3d 412 (3d Cir. 1999). . . . . . . . . . . . . . . . 22

*Patterson v. Colorado,* 205 U.S. 454 (1907). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Perryman v. H&R Trucking, Inc.,* 135 Fed. Appx. 538, 2005 WL 1463208 (3d
Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224
(3d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Pineda v. Ford Motor Company,* 520 F.3d 237 (3d Cir. 2008). . . . . . . . . . . . . . . 20

*Roebuck v. Drexel Univ.,* 852 F.2d 715 (3d Cir. 1988). . . . . . . . . . . . . . . . . . . . . 31

*Sandrow v. United States,* 832 F. Supp. 918 (E.D.Pa.1993) . . . . . . . . . . . . . . . . 31

*See Tannery v. United States,* 483 U.S. 107 (1987). . . . . . . . . . . . . . . . . . . . . . . 38

*Spain v. Gallegos,* 26 F.3d 439 (3d Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Springer v. Smith,* 153 N.W.2d 300 (Neb. 1967). . . . . . . . . . . . . . . . . . . . . . . . . 13

*U.S. v. Cross*, 308 F.3d 308 (3d Cir.2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*U.S. v. Stansfield*, 101 F.3d 909 (3d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Brandenburg*, 155 F.2d 110 (3d Cir. 1946). . . . . . . . . . . . . . . . 39

*United States v. Michener*, 152 F.2d 880 (3d Cir. 1945). . . . . . . . . . . . . . . . . . . 39

*United States v. Posner*, 644 F.Supp. 885 (S.D. Fla. 1986). . . . . . . . . . . . . . . . . 39

*United States v. Universal Rehabilitation Services (PA), Inc.*, 205 F.3d 657 (3d Cir.2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Vredeveld v. Clark,* 504 N.W.2d 292 (Neb. 1993). . . . . . . . . . . . . . . . . . . . . . . . . 13

*Walker v. Gordon*, 46 Fed. Appx. 691 (3d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . 20

*Womble v. J.C. Penney*, 431 F.2d 985 (6th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . 39

## STATUTES

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1332. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## COURT RULES

Fed. R. Civ. P. 59. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. Evid. 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Evid. 606(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Fed. R. Evid. 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999). . . . . . . . . . . . . . . . . . . . . . 24

## OTHER AUTHORITIES

"Post Traumatic Stress Disorder," National Institute of Mental Health,
    http://www.nimh.nih.gov/health/publications/post-traumatic-stress-di
    sorder-easy-to-read/complete-index.shtml. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

"Post Traumatic Stress Disorder," WebMD,
    http://www.webmd.com/mental-health/post-traumatic-stress-disorder-
    ptsd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

"Post Traumatic Stress Disorder;  Symptoms, Treatment, and Self-Help,"
    HelpGuide.Org,
    http://www.helpguide.org/mental/post_traumatic_stress_disorder_sy
    mptoms_treatment.htm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## SUBJECT MATTER & APPELLATE JURISDICTION

The United States Court of Appeals for the Third Circuit has jurisdiction over this matter pursuant to 28 U.S.C. § 1291. The appeal is from an Order by the Honorable Douglas E. Arpert, U.S.M.J., of the United States District Court for the District of New Jersey, denying Plaintiff's Motion for a New Trial entered in this action in the Court's Minutes of Proceedings dated October 16, 2012; from the Judgment entered in this action on September 4, 2012; from the Order by Judge Arpert granting and denying a series of motions *in limine* entered in this action on March 29, 2012; and from all other Orders that are adverse to Plaintiff. This appeal is from a final decision of the United States District Court of the District of New Jersey, preserved by a Notice of Appeal, filed on November 7, 2012. (A1.)

The basis for the district court's jurisdiction was diversity of citizenship under 28 U.S.C. § 1332(a). Plaintiff Sania Mahmood was a citizen of the State of New Jersey; Defendant Joseph Narciso, Jr. was a citizen of the Commonwealth of Pennsylvania; Defendant Mayflower Transit, LLC was a limited liability company whose sole member was Transportation Services Group, Inc., a citizen of the State of Missouri; and Defendant Vantage Blue Solutions, Inc. was a corporation incorporated under the laws of the State of Minnesota, with its principal place of business located

1

in Hermantown, Minnesota. (A35.) The amount in controversy exceeded the sum of $75,000.00, exclusive of interest and costs.

# ISSUES

1.     Did the court below err in holding that evidence relating to the force of impact and the circumstances surrounding an automobile collision was irrelevant as liability had been stipulated, but where the plaintiff's physical and psychological injuries and the monetary damages to be awarded for those injuries was disputed?

2.     Did the court below err when, *in limine* and without conducting a *Daubert* hearing, it excluded portions of an expert witness's testimony that had not been deposed on the theory that the expert's report failed to provide an adequate basis for his opinions?

3.     Did the court below err when it denied plaintiff's motion for a new trial on the basis that the jury's verdict was shockingly disproportionate to the injuries sustained?

4.     Did the court below err when it failed to investigate into whether or not the jury deliberations or verdict may have been improperly influenced after a juror contacted defense counsel to inquire as to whether or not the jury's verdict was higher or lower than the defense's offer of judgment?

# **STATEMENT OF THE CASE**

On May 11, 2009, Plaintiff Sania Mahmood filed the Complaint in the Superior Court of New Jersey for Mercer County, naming Joseph Naciso Jr., Mayflower Transit, LLC ("Mayflower"), and Vantage Blue Solutions, Inc. ("Vantage Blue") as Defendants. (A38.) In this Complaint, Ms. Mahmood alleged that on June 12, 2007, she was an occupant of a motor vehicle that was hit by a tractor-trailer driven by Joseph Narciso Jr. and owned by Mayflower and Vantage Blue and that as a result of that accident she sustained personal injuries. Defendants removed this matter to the United States District Court for the District of New Jersey on June 2, 2009. (A35.) In due course Defendants answered the Complaint. (A46-55.)

Prior to trial, the Defendants made an offer of judgment in the amount of $250,000.00. The parties were unable to reach a settlement and eventually, the matter was reached for trial as to damages, which was assigned to the Honorable Douglas E. Arpert, U.S.M.J. On October 28, 2011, Defendants filed a series of motions *in limine* to preclude the testimony of various experts, including Cary Skolnick, M.D. ("Dr. Skolnick") and Mona G. Yudkoff, R.N. ("Ms. Yudkoff"). (A56.) Plaintiff filed opposition to Defendants' motions *in limine* on November 21, 2011. (A86.) The trial court conducted oral argument on the motions on February 10, 2012. On March 29,

2012, the court issued a Memorandum Opinion and Order, granting Defendants' motion as it related to Dr. Skolnick's opinions and granting and denying Defendants' motion as it related to Ms. Yudkoff's opinions. (A3.) On April 19, 2012, Plaintiff filed a Motion for Reconsideration, which was denied by Order dated April 27, 2012. (A159.)

The trial was conducted before Judge Arpert and a jury over five days, from August 20 to August 24, 2012.[1] The jury concluded that Ms. Mahmood had suffered injuries as a result of the accident with the tractor-trailer but awarded her only $25,000.00 in compensatory damages. (A17a-3.) A Judgment was thereafter entered confirming the verdict. (A17a-5.)

Plaintiff thereafter moved for a new trial. In her moving papers, Ms. Mahmood contended that the jury's damages award was inadequate in light of the evidence and that uncontroverted evidence established that the jury improperly considered

---

1.    In this Brief,
>            "1T" refers to the transcript of the trial dated August 20, 2012, which is reprinted on pages 198 to 375 of the Appendix,
>            "2T" refers to the transcript of the trial dated August 21, 2012, which is reprinted on pages 376 to 524 of the Appendix,
>            "3T" refers to the transcript of the trial dated August 22, 2012, which is reprinted on pages 535 to 636 of the Appendix,
>            "4T" refers to the transcript of the trial dated August 23, 2012, which is reprinted on pages 637 to 842 X of the Appendix, and
>            "5T" refers to the transcript of the trial dated August 24, 2012, which is reprinted on pages 834 to 887 of the Appendix.

information regarding the Defendants' offer of judgment. (A181.) On October 16, 2012, Judge Arpert heard oral argument in the Motion. A conforming Order was thereafter entered. (A17a-7.)

Plaintiff now appeals.

# STATEMENT OF FACTS

In the early afternoon of June 12, 2007, Plaintiff Sania Mahmood was driving a Honda Civic northbound on the New Jersey Turnpike in Bergen County. (1T 40-2 to 40-16.) Ms. Mahmood was driving in the left lane of the highway when suddenly an 18-wheel tractor-trailer driven by Defendant Joseph Narciso Jr. moved into her lane, colliding with her vehicle and crashing it into the center median of the highway. During the accident, there were multiple impacts between Ms. Mahmood's car and the tractor-trailer. (1T 45-7 to 45-9.) After her car finally came to a stop, Ms. Mahmood's legs were stuck beneath the dashboard area of her car, (1T 47-1 to 47-5), and her body was leaning over the steering wheel. (1T 45-20 to 45-22.) Ms. Mahmood had to be extricated through the driver's window by the emergency medical squad. (1T 47-20 to 47-25.)

Because liability was stipulated, the only issues to be resolved at the trial were damages. Likewise, because there has not been any cross-appeal by the Defendants, the only issues that need to be considered on this appeal are the damages issues. Since the medical expenses were covered by PIP and neither lost income nor *per quod* claims were being made, these damages issues related solely to the compensation for

disability, impairment, disfigurement, loss of the enjoyment of life, pain and suffering.

Prior to trial, Defendants' attorney moved *in limine* to exclude portions of the expert opinion of Cary Skolnick, M.D., a licensed medical doctor in the State of New Jersey and Board Certified in Orthopedic Surgery. (A56.) Dr. Skolnick rendered three reports. (A59-69.) In particular, the defense sought to preclude Dr. Skolnick from testifying with respect to his diagnosis of temporomandibular joint syndrome ("TMJ"), his conclusion that Ms. Mahmood was limited to sedentary employment, and his recommendation that Ms. Mahmood undergo cervical fusion surgery. With respect to these opinions, defense counsel argued that they constituted "net opinions."

The trial court, without conducted a *Daubert* hearing, granted Defendants' motion to preclude all three aspects of Dr. Skolnick's testimony on the theory that Dr. Skolnick's report lacked the requisite detail and analysis to support his conclusions. (A3.) Consequently, Ms. Mahmood's life care plan expert, Mona Yudkoff, R.N., was prohibited from testifying regarding the costs associated with the cervical fusion surgery and TMJ injury in the future. (A12-14; A17a-2.) The preclusion of Ms. Yudkoff's testimony in this respect would have eliminated much of the damages set forth in her report. As such, Ms. Mahmood's counsel made the decision not to call her as an expert at all during the trial.

8

During the trial, the defense objected to the introduction of evidence relating to the force of impact and the circumstances surrounding the tractor-trailer's collision with Ms. Mahmood's vehicle on the New Jersey Turnpike. (1T 42-4 to 42-9). Defendants argued that because they had stipulated as to liability, the circumstances surrounding the "mechanics of the accident" were not relevant. (1T 42-4 to 42-9.) Plaintiff's counsel pointed out that the evidence was being offered not to prove causation but, instead, to address the disputed issue of the severity of Ms. Mahmood's injuries as a result of the accident. (1T 41-17 to 41-21.) After considering both positions, the court ruled that evidence relating to the "mechanics of the accident" was not relevant as the defense had stipulated as to liability. (2T 71-23 to 72-2.)

Throughout the five-day trial, defense counsel objected to any reference Ms. Mahmood made to the circumstances surrounding the collision or the fact that Ms. Mahmood's vehicle was totaled in the collision. The trial court sustained the objections. (1T 42-13 to 42-16; 1T 44-13 to 45-4; 2T 69-6 to 69-18; 2T 71-2 to 72-2). Additionally, every time one of the doctors - including the defense's own doctors – tried to bring up information relating to the happening of the accident, defense counsel objected and the trial court sustained the objection. (2T 89-3 to 90-3; XT 36-2 to 36-16; 4T 7-25 to 8-18; and 4T 174-7 to 176-5.) Not only did the trial court exclude evidence as it related to Ms. Mahmood's physical injuries, it also excluded

9

evidence of the trauma and severity of the accident as it related to Ms. Mahmood's Post Traumatic Stress Disorder ("PTSD") claim.   (2T 89-3 to 90-3.)

The jury concluded that Ms. Mahmood was in fact injured in the accident. One of the central points of contention between the parties during the trial of this matter was the extent to which Ms. Mahmood had injured her back and neck during two prior automobile accidents.   Thus, it would be appropriate to first look back at the course of treatment Ms. Mahmood received for those earlier accidents before turning to the course treatment Ms. Mahmood received following the 2007 accident giving rise to this litigation.

## A. Treatment Following the 2002 and 2006 Accidents.

On February 22, 2002, Ms. Mahmood was involved in an automobile accident in which her vehicle was rear-ended by another car.   (1T 95-14 to 95-23.)   After that accident, Ms. Mahmood had complaints relative to her neck, back, right shoulder, and right leg.   (1T 96-1 to 96-6.)   Ms. Mahmood missed two days of work following the 2002 accident, after which she returned to her full-time position as a waitress.   (1T 96-17 to 96-22.)   On March 7, 2002, Ms. Mahmood began treating at Mercerville Comprehensive Healthcare, (1T 113-19 to 113-22), receiving only conservative treatment, such as physical therapy and chiropractic care.   (1T 96-5 to 96-14.)   Both cervical and lumbar MRIs taken after the 2002 accident showed disc bulges, but no

herniations. (1T 131-16 to 131-22.) Ms. Mahmood's complaints from the 2002 accident ended sometime around September of 2003, when she stopped receiving treatment. They did not re-manifest themselves until December of 2006, when Ms. Mahmood was involved in another car accident. Thus, from September of 2003 until December 2006, Ms. Mahmood had no medical treatment or complaints to her back and neck.

On December 26, 2006, Ms. Mahmood was involved in a second rear end accident. (1T 91-25 to 92-5.) After that accident, Ms. Mahmood had complaints relative to her neck and back. She went to the emergency room at Robert Wood Johnson University Hospital of Hamilton. (3T 54-8 to 54-16.) They did a CAT scan, gave her medication, and discharged her. After missing ten days of work, Ms. Mahmood again returned to work as a waitress.

As in the 2002 accident, Ms. Mahmood received only conservative treatment, such as physical therapy and chiropractic care, following the 2006 accident. (1T 93-17 to 93-19.) She went for chiropractic treatments of her neck and back for about a month and a half. Her diagnosis was cervical thoracic sprain and strain as well as lumbar strain with headaches. (1T 93-17 to 93-19; 1T 93-22 to 92-24.) Beginning in February of 2007, Ms. Mahmood began treating with Doctor Alexander M. Pendino, a neurologist, on a regular basis. (1T 92-8 to 92-15.) Dr. Pendino referred

11

Ms. Mahmood to physical therapy. Indeed, Ms. Mahmood saw Dr. Pendino the week prior to the 2007 accident. (1T 30-15 to 30-17.)

**B.    Treatment Following 2007 Accident.**

With this understanding of the earlier treatment, it is now appropriate to turn to the treatment Ms. Mahmood received following the 2007 accident that gives rise to this litigation. Immediately after the impact, Ms. Mahmood began to experience pain in various part of her body, in particular her head, chest, shoulders, and legs (1T 49-11 to 50-12.) Ms. Mahmood was taken by ambulance to Franciscan St. James Health's Emergency Room. (1T 49-21.) Diagnoses included multiple sprains and contusions. Recommendations included analgesic medications and follow-up with her physician.

The following day, Ms. Mahmood presented to the Emergency Room at Robert Wood Johnson University Hospital complaining of extreme chest pain. (1T 52-16 to 53-10.) Ms. Mahmood was advised that she had deep bruising and pressure in her chest. (1T 52-16 to 52-21.) She was prescribed narcotic pain medication. (1T 53-14 to 53-17.)

Just days after the accident, Ms. Mahmood went to see Dr. Pendino, her neurologist. At that time, Ms. Mahmood complained of severe pain in her neck, back, chest, feet, shoulder, and knee following the accident with the tractor-trailer. (1T 54-

12

23 to 54-24.) An EMG test performed by Dr. Pendino on June 19, 2007, revealed lumbar radiculopathy at L5-SI. (3T 38-18 to 39-1.) Dr. Pendino immediately referred Ms. Mahmood to Doctor Martin Scott, an orthopedist. (1T 56-17 to 56-23.) Dr. Scott diagnosed cervical sprain and strain, dorsal lumbar sprain and strain with cervical facet and lumbar fact arthrosis, upper extremity and lumbar radiculitis, and cerebral concussion. (3T 41-8 to 41-16.) Physical therapy was initiated.

Dr. Pendino also referred Ms. Mahmood to Princeton Orthopaedic Associates. (1T 58-10 to 58-16.) Physicians at Princeton Orthopaedic Associates addressed multiple injuries. In July of 2007, physicians treated bilateral ankle sprains with ankle supports. (3T 41-17 to 41-19.) Ms. Mahmood treated with Doctors Richard E. Fleming Jr. and Michael N. Jolly at Princeton Orthopaedics with respect to her knees. (1T 65-14 to 65-16.) In August of 2007, Dr. Fleming injected her with cortisone in the right knee. (3T 42-21 to 42-24.) An MRI of the right knee on August 6, 2008, revealed degeneration of the ACL and quadriceps tendinopathy. (3T 49-11 to 49-17.)

Trigger point injections, cortisone injections, and acupuncture were recommended to treat bilateral shoulder pain. Doctor Michael A. Palmer performed acupuncture several times on Ms. Mahmood's neck and shoulder as well as several sacroiliac joint injections in her lower back. (1T 59-5 to 59-12.) An MRI on

13

November 11, 2007, revealed C5-6 disc protrusion and disc herniation and disc degeneration. (3T 44-3 to 44-5.)  In his report, Dr. Skolnick noted that based on a review of the MRI reports, an MRI on November 27, 2007 revealed stenosis at L4-L5 with a new disc protrusion, as compared to an MRI taken before the collision with the tractor-trailer on May 21, 2007. (A61.)

In December of 2007, Ms. Mahmood underwent epidural injections at right L5-S1. (3T 45-23 to 45-25.)  Doctor Jeffrey Abrams at Princeton Orthopaedics also saw Ms. Mahmood for her complaints of chest pain.   (1T 63-20 to 63-24.)  Dr. Abrams gave Ms. Mahmood several trigger point injections in her right cervical and trapezius.  (1T 65-3 to 65-7.)

Some time after the accident, Ms. Mahmood returned to work as a hostess. (1T 88-17 to 88-22.)  She was unable to return to her position as a waitress, however, due to the pain and the medications she was taking. (1T 88-23 to 89-5.)

About a year after the accident in 2007, Ms. Mahmood presented to a pain management doctor, Doctor Adam Sackstein, for the first time.  (1T 66-21 to 67-2; 1T 67-5 to 67-7)  Ms. Mahmood treated with Dr. Sackstein for about a year. (1T 70-7 to 70-9.)  Dr. Sackstein prescribed Ms. Mahmood heavy narcotic medications for pain.  With respect to her knee, an MRI revealed degeneration of Ms. Mahmood's

14

anterior cruciate ligament. (3T 49-24 to 49-25.) With respect to her shoulder, an MRI revealed impingement syndrome with tendinopathy. (3T 50-1 to 50-5.)

Dr. Sackstein performed multiple epidural injections to the cervical and lumbar spine, facet joint injections, and sacroiliac joint injections. (1T 68-15; 1T 69-25 to 74-4.) The injections helped Ms. Mahmood only minimally. (3T 49-24.) As a result, Doctor James G. Lowe, a surgeon, recommended that Ms. Mahmood undergo a discrogram, (1T 72-13 to 72-15), which Dr. Sackstein performed. The discogram revealed concordant pain at L4-5 and L5-S1 and discordant pain at L3-4. (3T 49-2 to 49-7.) Based on those results, Dr. Lowe diagnosed a cervical herniated disc with radicular symptomatology, a lumbar herniated disc, and axial mechanical low back pain with radiculopathy. (3T 49-13 to 49-17.) Dr. Lowe recommended surgery. (1T 74-14 to 74-20.)

On February 2, 2009, Dr. Lowe performed a posterior open L4-5, L5-SI laminectomy and bilateral discectromies with decompression, posterior interbody arthrodesis and instrumentation (multiaxial screw fixation) from L4 to sacrum, with left iliac autograft. (1T 74-20 to 74-24.) Recovery from surgery was complicated by infection requiring antibiotic intervention by PICC line with vacuum-assisted wound therapy. (1T 76-8 to 76-11.) As a result, Ms. Mahmood treated for several weeks with Doctor Christopher Lucasti, an infectious disease specialist. (1T 76-24

to 77-3.) Ms. Mahmood was left with a six to seven inch scar from the surgery. (1T 90-19 to 90-23.) After Ms. Mahmood's infection healed, she resumed physical therapy at Pinnacle Therapy for another two and a half years. (1T 80-14 to 80-19.)

Conservative treatment and physical therapy did not alleviate symptoms. Ms. Mahmood has been unable to return to work since her surgery. (1T 38-23 to 39-2.) Still experiencing pain, she began seeing Doctor Maher Ibrahim, a pain management specialist, who administered additional injections including cervical spine facet block, epidural block, and multiple trigger point injections in 2009 and early 2010. (1T 81-12 to 81-19.) She presented to the emergency room several times for pain medication in 2010.

In addition to her physical injuries, on June 25, 2007, just days after the collision with the tractor-trailer, Ms. Mahmood began treating with a psychologist, Doctor John M. Charuk for her psychological injuries. (1T 83-16 to 83-25.) It was not until after the 2007 accident that Ms. Mahmood first sought psychological care. (1T 88-14 to 88-16.) Ms. Mahmood complained of difficulty sleeping. (2T 95-12 to 95-24.) Additionally, Ms. Mahmood complained of irritability, fatigue, problems with concentration, and depression. Ms. Mahmood also complained of recurrent nightmares regarding the accident. Dr. Charuk referred Ms. Mahmood to Dr. Amin, a psychiatrist for depression and anxiety treatment. (1T 86-17.) Dr. Amin prescribed

Ms. Mahmood antidepressants, mood disorder medication, and sleeping medication. (1T 87-22 to 88-5.) At trial, Doctor Edward H. Tobe, a board certified psychiatrist, opined that Ms. Mahmood suffered from Post Traumatic Stress Disorder, a mood disorder, and a cognitive disorder as a result of the 2007 accident. (2T 87-14 to 87-15.)

Ms. Mahmood was 33 years old at the time of the accident. (1T 39-20.) She described her current complaints from the injuries, which focused on her neck, lower back, right shoulder, and right knee. (1T 97-15 to 101-1.) She described how the injuries from the accident affected her ability to perform normal activities. Before the accident, Ms. Mahmood explained that her pain was manageable. She lead a normal life, exercising and working as a waitress. (1T 99-20 to 99-24.) She also explained that, before the accident, she lead a very active lifestyle, running and jogging and working 70 hours a week. (1T 103-7 to 103-11.) She noted that after her surgery in 2009, she was unable to return to her position as a hostess and that she was presently unemployed. (1T 102-19 to 130-5.) She explained that driving long distances was extremely uncomfortable. Ms. Mahmood also explained that being in pain all the time affects her state of mind. While she was always a happy person prior to the accident, (1T 106-1 to 106-7), she explained that her irritability and mood swings due

17

to her injuries have strained her relationships with family and friends. (1T 106-13 to

107-12.)

# RELATED CASES AND PROCEEDINGS

This case has not previously been before the Third Circuit Court of Appeals and is being appealed, in the first instance, from Order(s) and Judgment(s) of the United States District Court. There are no other cases or proceedings in any way related, completed, pending before this Court or any other court or state or federal agency.

# STANDARD OF REVIEW

This Court reviews a district court's decision regarding admissibility of evidence for abuse of discretion. *General Electric v. Joiner,* 522 U.S. 136, 146 (1997). An abuse of discretion occurs when the decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000); *Pineda v. Ford Motor Company*, 520 F.3d 237, 243 (3d Cir. 2008); *Walker v. Gordon*, 46 Fed. Appx. 691, 693-694 (3d Cir. 2002).

In reviewing the issue or jury misconduct and the procedures employed by the district court to investigate the same, this Court reviews the district court's determinations under an abuse of discretion standard. *Martinez v. Food City, Inc.,* 658 F.2d 369, 372 (5th Cir. 1981).

# LEGAL ARGUMENT

## POINT I.

### THE COURT BELOW ERRED BY EXCLUDING EVIDENCE RELATING TO THE FORCE OF IMPACT AND THE CIRCUMSTANCES SURROUNDING THE AUTOMOBILE COLLISION. THE COURT'S DECISION TO EXCLUDE THIS EVIDENCE WAS BASED ON ITS ERRONEOUS CONCLUSION THAT IT WAS NO LONGER RELEVANT IN LIGHT OF THE FACT THAT THE DEFENDANTS HAD STIPULATED AS TO LIABILITY. THE EVIDENCE, HOWEVER, WAS DIRECTLY RELEVANT TO THE DISPUTED ISSUE OF THE PLAINTIFF'S INJURIES. AS SUCH, THIS COURT MUST GRANT A NEW TRIAL ON THE ISSUE OF DAMAGES.

The trial court abused its discretion and committed reversible error when it excluded evidence relating to the nature and severity of the automobile collision. The trial court's decision to exclude this evidence was based on the erroneous conclusion that such evidence was no longer relevant in light of the fact that the defense had stipulated as to liability.

The definition of relevant evidence is very broad. *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004). Under Federal Rule of Evidence 401, " '[r]elevant evidence' means evidence having any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. This Court has held that Rule 401 "does not raise a high standard." *Hurley v. Atl. City Police Dept.*, 174 F.3d 95, 109–110 (3d Cir.1999). This Court has also held that "evidence is irrelevant only when it has no tendency to prove [a consequential fact]," and that while Rule 401 gives "judges great freedom to admit evidence, [it] diminishes substantially their authority to exclude evidence as irrelevant." *Spain v. Gallegos*, 26 F.3d 439, 452 (3d Cir.1994) (citations omitted).

During trial, the defense objected to the introduction of evidence relating to the force of impact and the circumstances surrounding the tractor-trailer's collision with Ms. Mahmood's vehicle on the New Jersey Turnpike. (1T 42-4 to 42-9). Defendants argued that because they had stipulated as to liability, the circumstances surrounding the "mechanics of the accident" were not relevant. (1T 42-4 to 42-9.) Plaintiff's counsel proffered that the evidence was being offered not to prove causation but, instead, to address the disputed issue of the severity of Ms. Mahmood-'s injuries as a result of the accident. (1T 41-17 to 41-21.) After considering both positions, the court ruled that evidence relating to the "mechanics of the accident" was not relevant as the defense had stipulated as to liability. (2T 71-23 to 72-2.) As such, throughout the five-day trial, defense counsel objected to any reference Ms.

3

Mahmood made to the circumstances surrounding the collision and the trial court sustained the objections. (1T 42-13 to 42-16; 1T 44-13 to 45-4; 2T 69-6 to 69-18; 2T 71-2 to 72-2). Additionally, every time one of the doctors - including the defense's own doctors – tried to bring up information relating to the happening of the accident, defense counsel objected and the trial court sustained the objection. (2T 89-3 to 90-3; 3T 36-2 to 36-16; 4T 7-25 to 8-18; and 4T 174-7 to 176-5.).

Even where defense counsel objected to evidence on other grounds, the trial court sustained those objections based on relevance. During direct examination of Ms. Mahmood, (1T 44-5 to 45-4), for example, the following exchange occurred:

> Mr. Smith: And as -- at any time during the impact with the truck, did any part of your body move inside the car?
>
> Ms. Mahmood: Well, at first impact, I didn't -- we didn't, you know, to be very honest, didn't know what was happening. Second impact, my car shaked and I pretty much lost control and by then I was pretty much aware that the truck is pulling into my lane, so I slammed into my, you know, on my accelerator so I can speed out of the lane --
>
> Mr. Segal: Objection, your Honor.
>
> The Court: Hold on. Mr. Segal.
>
> Mr. Segal: The --
>
> The Court: You are getting into the mechanics of this accident.
>
> Mr. Segal: And it was not responsive to the question. Mr. Smith's question was fine, the answer that went well behind what he asked,

that's why I -- I didn't mean to interrupt her, but I didn't have a problem with the question.

Mr. Smith:   Let me see if I can help move it along, Judge.

The Court:   Ladies and gentlemen, to make clear to all concerned, there is, as I indicated to you earlier, there is a stipulation regarding the defendant's responsibility for this accident.   The objection that Mr. Segal is raising, with respect to Ms. Mahmood's answer being nonresponsive, is sustained and the answer to that question will be stricken.  Mr. Smith, you want to continue.

With respect to trial testimony relating to the damage to Ms. Mahmood's

vehicle, (2T 71-2 to 72-2), the following took place:

Mr. Smith:   I just asked you, why did you want to cancel it? You said, You didn't have any transportation. Why didn't you have any transportation?

Ms. Mahmood:     My car was totaled. I had no car, nothing.

Mr. Segal:   Your Honor, we're now getting back into the accident, the mechanics, damage, et cetera.

The Court:   I understand.

. . .

Mr. Segal:   Your Honor, can I at least ask the part about the car being totaled be stricken. She said, no transportation. That was more than sufficient. There [are] no photographs, no nothing.

The Court:   There is no basis to support that. It's not an element of this case.   I'm going to sustain the motion -- the testimony with respect to the condition of Ms. Mahmood's car following the accident. That should be stricken and disregarded, folks.

5

Not only did the trial court exclude evidence as it related to Ms. Mahmood's physical injuries, but, it also excluded evidence of the trauma and severity of the accident as it related to Ms. Mahmood's Post Traumatic Stress Disorder (PTSD). During direct examination of Edward Tobe, Plaintiff's examining psychiatrist, (2T 89-3 to 90-3), the following took place:

> Dr. Tobe:    So, when was the shoulder hurt? The same thing happens here with this lady. There is a priming effect to the brain tissue. It isn't just in our species, it's in other species also. In which there is trauma and then people sort of collect themselves and then there's the next trauma. And keep in mind that in '07 a particular trauma that she had was rather dramatic assuming the accuracy of the information I have. This was a New Jersey Turnpike –
>
> Mr. Siegel: Objection, your Honor. It appears to be starting to go into the description of the accident which as we have already stipulated to liability and I don't believe there is a relevance for him to go into the description of same.
>
> The Court:  Mr. Smith.
>
> Mr. Smith:  It's relevant to his diagnosis with respect to causation.
>
> The Court:  I agree. I think it is relevant. The mechanics of the accident itself, perhaps not, we've covered that ground but I assume the doctor is going to talk about the effect of that accident on Ms. Mahmood. So, Doctor, we're not particularly interested in the mechanics of that accident because obviously you weren't there.
>
> Dr. Tobe: Yes.
>
> The Court:  But the effect of that accident, I'm going to allow.

6

Mr. Siegel: Thank you.

The trial court's reasoning completely disregarded that even after Defendants' stipulated as to liability, the jury's responsibility was to determine the severity of Ms. Mahmood's physical and psychological injuries and the monetary damages to be awarded for those injuries. Ms. Mahmood and all other witnesses were prohibited from testifying as to the damage to either vehicle as a result of the accident, the fact that Ms. Mahmood's vehicle was totaled, the speed of either vehicle at the time of impact, the traffic conditions, the point of impact, the force of impact, the trauma of the accident, the cause of the accident, the size of the truck that collided with Ms. Mahmood, whether or not other cars were involved in the accident or were near Ms. Mahmood, or any other relevant circumstances relating to the collision with the tractor-trailer.

As discussed in further detail below, it is well-established under both New Jersey and federal law that such evidence is admissible where there is an issue as to the seriousness of the plaintiff's physical and psychological injuries. As the evidence was directly relevant to the disputed issue of damages, the trial court erred by using this ruling as a basis to exclude relevant and admissible evidence on the issue of the severity of Ms. Mahmood's injuries. For these reasons, this Court must grant a new trial on the issue of damages.

7

## A.   New Jersey Law Regarding Admission of Evidence Applies to this Action.

This action was originally filed in the Superior Court of New Jersey and removed to the United States District Court for the District of New Jersey based on diversity jurisdiction. It is well-established that in a case removed to federal court based on diversity jurisdiction, the law of the state in which the action was originally filed governs substantive issues while the law of the federal court system governs procedural issues. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). When specific rules regarding the admissibility of evidence are so intertwined with state law that they become substantive, however, state law governs the admissibility of evidence. *Feldman v. Allstate Insurance Co., et al.*, 322 F.3d 660, 666 (9th Cir. 2003). In the instant case, the rules regarding whether the circumstances surrounding the automobile collision are admissible are so intertwined with New Jersey's substantive law on negligence that they become substantive. New Jersey law, therefore, governs the admissibility of such evidence.

The trial court decision's that evidence relating to the mechanics of the accident was not relevant to Ms. Mahmood's physical and psychological injuries, runs counter to numerous New Jersey cases holding directly to the contrary: that

such evidence is relevant and properly considered by the jury in assessing the

injuries claimed by the plaintiff. Indeed, the New Jersey Supreme Court in *Brenman*

*v. Demello,* 191 N.J. 18, 35–36 (2007), had an opportunity to address precisely this

issue with respect to physical injuries. In that case the plaintiff was rear-ended by

a vehicle driven by the defendant in stop and go traffic. *Id.* at 19. The defendant

conceded liability. *Ibid.* Before trial, plaintiff moved *in limine* to exclude

photographs showing minimal damage to her car immediately after the accident,

arguing that expert testimony was required to show a correlation between the

damage to the vehicle and the cause or extent of injuries claimed. The New Jersey

Supreme Court denied the plaintiff's request, noting that, "in most cases, there is a

relationship between the force of impact and the resultant injury, and the extent of

that relationship remains in the province of the factfinder." *Id.* at 25. The Court

explained:

> Juries are entitled to infer that which resides squarely in
> the center of everyday knowledge: the certainty of propor-
> tion, and the resulting recognition that slight force most
> often results in slight injury, and great force most often is
> accompanied by great injury. Thus, although it must be
> conceded that the force of impact, when two automobiles
> collide, does not necessarily justify an inference that the
> occupants of the vehicles sustained serious physical
> injuries, at the same time it is a generally accepted rule
> that evidence of the speed at which the colliding cars were
> traveling, the severity of the physical impact and the

> manner of the happening of the accident is admissible
> where there is an issue as to the seriousness of the plain-
> tiff's injuries. And this, too, despite admitted liability.

*Id. See also, Gambrell v. Zengel,* 110 N.J. Super. 377 (App. Div. 1970). Recogniz-

ing that slight force does not always result in slight injury and vice versa, the Court

in *Brenman* held that, rather than excluding such evidence altogether:

> a party opposing the admission of photographs of damage
> to a car remains free to offer expert proofs for the purpose
> of showing that there is no relationship between the extent
> of the damage and the cause and severity of the resulting
> injuries. Conversely, a party proposing the use of photo-
> graphs of impact may tender its own expert proofs to
> further support the proposition in its case-in-chief-either
> that slight impact force results in no or slight injury, or
> that great impact force results in great injury-or to rebut its
> opponent's assertions. In the end, however, such expert
> proofs address the weight to be given to photographs of
> impact, not their admissibility.

*Id.* at 1121.

Just as evidence relating to the severity of the impact an accident is relevant

to the issue of the physical injuries sustained, evidence relating to the circumstances

surrounding an accident is directly relevant to the extent of psychological injuries,

such as PTSD, sustained. PTSD develops following a traumatic event, such as a car

accident. The more traumatic an event is, the more likely a person is to develop

PTSD.[2] Common sense dictates that evidence relating to the traumatic event itself is directly relevant to a plaintiff's PTSD claim.[3] If an accident is minor, a reasonable juror could conclude that it would be unlikely for a plaintiff to really have PTSD. On the other hand, if the circumstances surrounding an accident are horrific, a reasonable juror would be much more likely to conclude a genuine instance of PTSD exists. Here, the jury should have been allowed to hear the circumstances surrounding the happening of the accident in order to properly gauge whether or not Ms. Mahmood's PTSD claim was credible. By excluding such evidence, the trial court effectively deprived the jury of the ability to make this determination. As such, Plaintiff's PTSD claim was seriously - if not completely – undermined in this case.

---

2.

> *See* "Post Traumatic Stress Disorder," National Institute of Mental Health, http://www.nimh.nih.gov/health/publications/post-traumatic-stress-disorder-easy-to-read/complete-index.shtml; "Post Traumatic Stress Disorder; Symptoms, Treatment, and Self-Help," HelpGuide.Org, http://www.helpguide.org/mental/post_traumatic_stress_disorder_symptoms _treatment.htm; and "Post Traumatic Stress Disorder," WebMD, http://www.webmd.com/mental-health/post-traumatic-stress-disorder-ptsd.

3.    While case law has affirmatively answered the question as to whether or not force of impact evidence is relevant to physical injuries sustained, there is a lack of case law in New Jersey regarding whether or not evidence relating to the circumstances surrounding an accident is relevant to psychological injuries sustained, such as PTSD. The lack of case law, however, demonstrates that the relevance of the evidence in this context is rather obvious.

It is beyond question that evidence relating to the mechanics of the collision

itself was directly relevant as to Ms. Mahmood's physical and psychological injuries.

For these reasons, this Court must reverse the decision of the court below and grant

a new trial.

**B.** **Even if Federal Law Applies, Evidence Regarding the Force of Impact and the Nature of the Accident was Admissible as it Related to Plaintiff's Physical and Psychological Injuries.**

Even if this Court were to determine that federal law governs the admissibility

of evidence relating to the automobile collision, such evidence would likewise be

relevant to the issue of Ms. Mahmood's physical and psychological damages and

therefore admissible under Rule 402.   Indeed, in *Perryman v. H&R Trucking, Inc.*,

135 Fed. Appx. 538, 542, 2005 WL 1463208 at *2 (3d Cir. 2005), this Circuit held

that "[s]urely photographs demonstrating that the vehicles involved in the accident

sustained no physical damage are highly probative in a case in which, as here, the

parties dispute the extent and cause of alleged personal injuries." In response to the

plaintiff's argument that he was prejudiced by the introduction of such photographs,

the Court wondered how he was prejudiced "unless he is erroneously asserting some

right to keep from the jury details of the very accident that spawned this suit." *Id.*

12

Moreover, the majority of jurisdictions follow the rule articulated in *Brenman* and allow juries to make the common sense inference that a major vehicle impact suggests major occupant injury, and vice versa. The Idaho Supreme Court has held that photographs of damage to a plaintiff's vehicle, as well as testimony as to how the accident occurred and as to the speed of the defendant's vehicle, is admissible even when liability is not in issue because such evidence is relevant and material to the probable extent of the plaintiff's injuries. *See Kinney v. Smith,* 508 P.2d 1234, 1236 (Idaho 1973). Similarly, the Nebraska Supreme Court has held that photographs and other evidence of damage to a plaintiff's vehicle are relevant to show force of impact, which, in turn, could assist the trier of fact in ascertaining the injuries plaintiff sustained. *See Vredeveld v. Clark,* 504 N.W.2d 292, 299 (Neb. 1993); *Springer v. Smith,* 153 N.W.2d 300, 302 (Neb. 1967). The Supreme Court of Minnesota is in accord with these holdings and reversed the decision of a trial court excluding evidence of physical impact offered by plaintiff. *See Baltus v. Von Der Lippe,* 196 N.W.2d 922 (Minn. 1972). The *Baltus* court held that "in an action for personal injuries, evidence of physical impact, if relevant and material, is admissible to indicate the extent of plaintiff's injuries, even though liability is admitted and the only issue to be tried is the amount of damages." *Id.* at 923. This court found its decision to be in line with the great weight of authority. *See, e.g.,*

13

*Howard v. Stoughton,* 433 P.2d 567 (Kan. 1967)(motion pictures and still photographs admissible to show seriousness and likelihood of injuries); *Millay v. Milwaukee Auto. Mut. Ins. Co.,* 120 N.W.2d 103 (Wis. 1963)(lay person's perception of speed of defendant's vehicle can properly be considered in determining the force of impact and whether it caused the injuries of which the plaintiff complained); *Fuentes v. Tucker,* 187 P.2d 752, 755 (Cal. 1947)(acknowledging rule that in an action for personal injuries, the force of impact and surrounding circumstances may be relevant and material to indicate extent of plaintiff's injuries). A number of other courts have also determined that evidence of damage to the parties' vehicles (or lack thereof) is highly relevant and far more probative than prejudicial. *See, e.g., Mason, v. Lynch,* 822 A.2d 1281 (Md. 2003)(finding that trial court did not abuse its discretion in ruling that photographs of damage to vehicles were relevant and that their probative value was not substantially outweighed by the danger of unfair prejudice).

Even though they made no such argument at trial, the defense may point to the minority position in *Davis v. Maute,* 770 A.2d 36 (Del. 2001), for the proposition the trial court properly excluded such evidence pursuant to Rule 403. Under Rule 403, relevant evidence is excluded if its prejudicial effect substantially outweighs its probative value. *See, e.g., United States v. Universal Rehabilitation Services (PA),*

14

*Inc.*, 205 F.3d 657, 664-65 (3d Cir.2000). In *Davis,* the court held that "absent competent expert testimony, any reference by the jury that minimal damage to the plaintiff's vehicle translates to minimal personal injuries amounts to speculation." *Id.* at 40. The court went on to note:

> "[P]hotographs of the plaintiff's car are not per se inadmissible. Instead, the admissibility of the photographs must turn on whether the risk that the jury will draw an improper inference from the photograph 'substantially outweighs' the probative value of the photographs under D.R.E. 403."

*Davis, supra,* at 41. This Court must reject any argument that such evidence was properly excluded pursuant to Rule 403 for three reasons, however.

First and foremost, at no point did the defense argue that the evidence should be excluded pursuant to Rule 403 nor did the district court conduct the careful balancing required by Rule 403 and the jurisprudence of this Court. The evidence was objected to and excluded based solely on relevance due to the fact that the defense had stipulated liability. Accordingly, this Court must conclude that the trial court improperly excluded the evidence.

Second, federal courts do not follow *Davis.* In fact, the only federal court that has considered *Davis* criticized that decision, stating:

> The Court disagrees that the photographs are not relevant. Even if there is not a perfect correlation between property damage and personal injury in automobile accidents, it does not mean that property damage

15

> is not relevant. In addition, the Court holds that the photographs should not be excluded under Fed. R. Evid. 403. Evidence of property damage is probative of the extent of personal injury, and it is not even outweighed, let alone substantially outweighed, by an danger of unfair prejudice.

*Bishop v. Dale Jessup, Inc., et al.,* No. 4:05CV397, 2006 WL  571979, at *7 (E.D.Mo. March 8, 2006)(internal citations omitted). Notably, *Bishop* appears to have held that such evidence may *never* be excluded under the balancing analysis articulated in Rule 403. Moreover, since *Davis* was issued in 2001, it has been roundly criticized and rejected by other jurisdictions, *see, e.g., Marron v. Stromstad,* 123 P.3d 992 (Alaska 2005); *Mason,* 822 A.2d at 1281. Additionally, it has also been clarified and significantly narrowed by the very court issuing the original opinion. *See Eskin v. Carden,* 842 A.2d 1222 (Del. 2004). Indeed, no jurisdiction has adopted a rule that collision evidence is *per se* inadmissible without expert testimony. *Marron,* 123 P.3d at 1009. Given the negative treatment of *Davis* by most other jurisdictions and by the Supreme Court of Delaware itself, there is no support for the contention that evidence relating to the accident should be excluded absent a qualified expert linking the damage to the plaintiff's claimed injuries.

Finally, the evidence in this case does not warrant exclusion under Rule 403. In *Davis,* the court held that the defendant's characterization of the subject accident as a "fender/bender," as well as the admission of photographs of the plaintiff's car

16

without a limiting instruction prejudiced the plaintiff. Here, there is no support for the argument that evidence relating to the circumstances of the accident is outweighed – let alone "substantially outweighed" – by the danger of unfair prejudice.[4] "When evidence is highly probative, even a large risk of unfair prejudice may be tolerable." *U.S. v. Cross*, 308 F.3d 308, 323 (3d Cir.2002) (discussing prejudice under Federal Rule of Evidence 403).

In summary, the court below should not have permitted defense counsel to keep from the jury relevant details of the very accident that gave rise to this suit. The law recognizes that common sense dictates that in most cases there is a strong relationship between force of impact and the resultant injury. The extent of that relationship remains in the province of the finder of fact. Evidence of the property damage, force of the impact, and the circumstances surrounding the accident in this case would have allowed the jury to weigh all relevant evidence to determine whether the heavy impact and force of the collision with the 18-wheeler on the New

---

4.    It is also noteworthy that the cases which raise the most concern for unfair prejudice are those where the defendant sought to admit photographs depicting minimal damage to the plaintiff's vehicle in order to show little or no personal injury to the plaintiff. *See, e.g., Brenman*, 921 A.2d at 1113; *Davis*, 770 A.2d at 40; *Cancio v. White*, 697 N.E.2d 749 (Ill.App.1998). In contrast, in the present case, the evidence showed heavy impact and severe damage to the plaintiff's vehicle, which could be evaluated by a jury in considering the gravity of the plaintiff's physical and psychological injuries.

Jersey Turnpike caused only slight injury or something greater. By excluding this evidence, plaintiff's counsel was deprived of the opportunity to argue that the extensive injuries alleged by Ms. Mahmood were caused by a heavy impact accident, resulting in a totaled vehicle. In fact, as a result of the trial court's exclusion of this evidence, the jury had no basis whatsoever to determine whether the 2007 collision was high or low impact. Such evidence would have allowed the jury to compare the 2007 collision to the low-impact 2002 and 2006 accidents. Additionally, such evidence would have given credibility to Dr. Scolnick's testimony that Ms. Mahmood's preexisting injuries were aggravated as a result of the collision with the tractor trailer. For these reasons, this Court must grant Plaintiff a new trial on the issue of damages.

# POINT II.

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PREMATURELY EXCLUDED POR-TIONS OF THE EXPERT TESTIMONY OF CARY SKOLNICK, M.D. THE EVIDENTIARY RECORD WAS INSUFFICIENT TO ALLOW THE COURT BELOW TO EXCLUDE DR. SKOLNICK'S OPIN-IONS ON THE BASIS THAT THEY WERE NOT ADEQUATELY EXPLAINED. MOREOVER, DR. SKOLNICK'S OPINIONS DID HAVE AN ADE-QUATE BASIS. AS SUCH, THIS COURT MUST GRANT A NEW TRIAL ON THE ISSUE OF DAM-AGES.**

Plaintiff's expert, Cary Skolnick, M.D., is licensed medical doctor in the State of New Jersey and Board Certified in Orthopedic Surgery. Dr. Skolnick rendered three reports in this matter. (A59-69.) Defense counsel moved *in limine* to limit certain portions of Dr. Skolnick's testimony. (A56.) In particular, the defense sought to preclude Dr. Skolnick from testifying with respect to his diagnosis of TMJ syndrome, his conclusion that Ms. Mahmood was limited to sedentary employment, and his recommendation that Ms. Mahmood undergo cervical fusion surgery. With respect to these opinions, defense counsel argued that they constituted "net opinions," as Dr. Skolnick had failed to set forth an adequate basis for the opinions.

The court below granted Defendants' motion to preclude all three aspects of

Dr. Skolnick's testimony. The court explained:

> [Dr. Skolnick's] report lacks the requisite detail and analysis to support
> his conclusions with respect to a TMJ injury or related treatment.
>
> . . .
>
> Likewise, with respect to his opinion that Plaintiff is only able to
> perform sedentary work, Dr. Skolnick's report provides no explanation
> or support for this conclusion. Dr. Skolnick fails to reference any prior
> testing, medical records or reports, and contains no independent
> findings, which underlie his statements concerning Plaintiff's func-
> tional capacity.
>
> . . .
>
> Finally, Dr. Skolnick's observation that cervical fusion surgery is
> "indicated" does not have adequate support. While such an opinion
> may be in his area of expertise, there are insufficient references in the
> Plaintiff's medical records and reports of other physicians to support
> this opinion. Specifically, Dr. Lowe's report (upon which Dr.
> Skolnick's conclusion is premised) does not recommend such surgery.
> It is also noteworthy that Dr. Lowe is expected to testify at trial and can
> offer his own opinion on this subject.

(A7-10). For the reasons that follow, the court below committed reversible error by

prematurely precluding those portions Dr. Skolnick's testimony.

The admissibility of expert testimony is governed by *Daubert v. Merrrell Dow*

*Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786 (1993), and Rule 702 of the

Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As the Supreme Court explained in *Daubert*, district court judges perform a "gatekeeping role," 509 U.S. at 596, by assessing whether expert testimony is both relevant and methodologically reliable in order to determine whether it is admissible under Rule 702. *Id.* at 590-91.

Under the law as applied in this Circuit, *Daubert* and Rule 702 call upon the Court to examine the admissibility of expert testimony in light of three factors: (1) the qualifications of the expert; (2) the reliability of his or her methodology and the application of that methodology; and (3) whether the testimony fits the matters at issue in the case. *In Re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-73 (3d Cir. 2000); *see Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). Thus, "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock,* 233 F.3d at 741.[5]

---

5.

    Under New Jersey law, an "expert's bare conclusions, unsupported by factual
                                                          (continued...)

The Third Circuit has long stressed the importance of holding *in limine* hearings in order to make the determination required by *Daubert*. *Daubert*, 753 F.2d at 1241 ("It would appear that the most efficient procedure that the district court can use in making the reliability determination in an *in limine* hearing."); *Padillas v. Storck-Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir. 1999). An *in limine* hearing is designed to afford the deciding court access to a detailed factual record at the evidentiary stage. *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 272 (3d Cir. 1991). It is particularly important that the party defending the admissibility of evidence be given adequate chance to do so. *Paoli*, 35 F.3d at 739.

In certain instances, courts are obligated to provide an *in limine* hearing before applying *Daubert* to exclude expert testimony. *Padillas*, 186 F.3d at 412.[6]   In

---

(...continued)

evidence" is an inadmissible net opinion. *Holman Enterprises v. Fid. & Guar. Ins.* Co., 563 F.Supp.2d 467, 472 (D.N.J.2008) (quoting *Buckelew v. Grossbard*, 87 N.J. 512, 435 A.2d 1150, 1156 (1981)). The "net opinion" rule is neither an evidentiary rule under the Federal Rules of Evidence nor a factor in the Daubert analysis, but it is merely a restatement of the "well-settled principle that an expert's bare conclusions are not admissible under the fit requirement of Rule 702." *Id.*

6.   The fact that a party did not request a hearing is not dispositive of the issue of whether a hearing should have been conducted. *Id.* This is because a court has an independent duty to conduct an *in limine* hearing prior to ruling on a *Daubert* motion when a record does not have sufficient information on which it can base its decision. *Padillas*, 186 F.2d at 417.

*Padillas*, for example, a hearing was required where the court excluded an expert's conclusions on the grounds that they were "insufficiently explained and the reasons and foundations for them inadequately and perhaps confusingly explicated." *Id.* In other words, where a report is "conclusory and [does] not adequately explain the basis for [the expert's] opinion or the methodology employed in reaching his conclusions," the "plaintiff needs an 'opportunity to be heard' on the critical issues of scientific reliability and validity." *Oddi*, 234 F.3d at 152 (quoting *Padillas*, 186 F.3d at 417).

Where the evidentiary record is substantial, in the form of expert reports and depositions, or the court has before it ample information from which to conclude that the expert lacks "good grounds" for his conclusions, an *in limine* hearing may be unnecessary. *Oddi.,* 234 F.3d at 153. In *Oddi*, despite a conclusory report, the Court held that a hearing was not required because the record was sufficient to make a reliability determination. The court distinguished the record in *Oddi* from the record in *Padillas*. Whereas in *Padillas* the record was scant and the district court had no way of determining how the proffered expert had arrived at his conclusions, the record in *Oddi* was "far from scant" and included: a preliminary report from the expert, an amended report prepared after the plaintiff's expert reviewed the deposition testimony of a defense expert, an affidavit prepared in response to the

23

*Daubert* challenge raised by the defendants in their summary judgment motion, and

two depositions of the plaintiff's proposed expert. *See Oddi*, 234 F.3d at 153. The

Third Circuit further explained that the holding in *Padillas* turned on the absence of

evidence – a conclusory report (from which the district court could not deduce a

methodology) and a scant record. *Id.* at 153-55. The Court reasoned that its position

was consistent with the United States Supreme Court's ruling in *Kumho Tire Co. v.*

*Carmichael,* 526 U.S. 137 (1999).

 In *Kumho Tire*, the Court approved of the district court's reasoning that the

two depositions submitted to the district court provided a sufficient basis for the

court to reach its *Daubert* decision and agreed with the district court's corresponding

refusal to grant the defendant's request for a *Daubert* hearing to challenge the

plaintiff's proffered expert testimony. *Id.* at 153-54.. The *Kumho Tire* Court

explained:

> A hearing is not always required prior to deciding whether to exclude
> testimony under Rule 702 and *Daubert*, but is necessary before
> excluding proffered expert testimony when the record does not clearly
> explicate the expert's opinions or the bases for the opinions such that
> it is impossible for the court to make the reliability determination.

Thus, failure to hold an *in limine* hearing constitutes an abuse of discretion where the

evidentiary record is insufficient to allow a district court to determine what

methodology was employed by the expert in arriving at his conclusion. *Id.* at 418;

*see also Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224

(3d Cir. 1993); *Hines v. Consolidated Rail Corporation v. General Electric Co.*, 926

F.2d 262, 269 (3d Cir. 1991); *In re Japanese Electric Prods Antitrust Litig.*, 723

F.2d 238, 276-277 (3d Cir. 1983); *Paoli I*, 916 F.2d 829, 836 (3d Cir. 1990).[7]

Turning to this case, this Court must find that the evidentiary record was

insufficient to allow the court below to exclude Dr. Skolnick's opinions on the basis

that his opinions were not adequately explained. Whether Dr. Skolnick could

provide explanation or support for his conclusions was a question of fact. The entire

evidentiary record consisted only of the expert's reports and briefings (which do not

constitute evidence) from the parties. Dr. Skolnick had not been deposed and

therefore had not been subjected to any cross examination, let alone rigorous cross

examination of his proffered testimony. Moreover, the court below did not articulate

a sufficient basis to exclude the various expert opinions. As such, the Third Circuit's

---

7.    A sufficient evidentiary record for purposes of admitting or excluding expert
      testimony usually includes, one or more reports of the expert, the expert's
      deposition, and briefings from the parties. *Oddi*, 234 F.3d at 153 ("Here, the
      district court already had before it the depositions and affidavits of the
      plaintiff's experts. Nothing more was required."); *Murray v. Marina District
      Development Co.*, 311 Fed. Appx. 521, 524, 2008 WL 2265300, at *2 (3d Cir.
      June 4, 2008)("We conclude that when the District Court granted Marina's
      motion *in limine*, it had a sufficient factual record before it to ascertain Sutor's
      methodology and make a proper reliability determination under *Daubert*. The
      record before the District court included Sutor's expert report, his deposition
      testimony, and the parties' briefs.").

concern that the court be furnished with an adequate factual record upon which to base its conclusions has not been met. Instead, the district court had no way of determining how Dr. Skolnick had arrived at his conclusions. The court could not rely on the deficiencies of the expert report to exclude his testimony, especially when the defense had not established the relevant grounds in deposition.

Had a *Daubert* hearing been conducted on this issue, Dr. Skolnick would have been able to explain the basis for his opinions. In addition to conducting his own physical examination of Ms. Mahmood, Dr. Skolnick based his opinions on his review of extensive medical records, treatment history, and the opinions of other professionals. (A86.) With respect to the diagnosis of TMJ, Dr. Skolnick would have explained that he relied on the records, opinions and findings of Ms. Mahmood-'s medical doctors in arriving at that conclusion, including Dr. Schor, who diagnosed TMJ and recommended additional treatment. (A88.) Likewise, Dr. Skolnick would have explained that his opinion that Ms. Mahmood was limited to sedentary employment was based on the various records of Dr. Weiss and James Lowe, M.D., which indicated Ms. Mahmood's vocational abilities and limitations. (A91.)

With respect to his opinion regarding the cervical fusion, Dr. Skolnick diagnosed cervical radiculopathy with disc herniation and recommended a cervical fusion to correct it. Had a *Daubert* hearing been conducted on this issue, Dr.

Skolnick would have explained that he had performed a physical evaluation of Ms. Mahmood's cervical spine and found a restrictive range of motion with associated muscle spasm. (A89.) Dr. Skolnick also would have explained that he noted tenderness of the scapula angles and trapezius spasm. He reviewed her medical records and the MRI which showed the disc herniations.

With respect to his opinion, Dr. Skolnick also relied upon the plethora of medical records available to him, including the reports of David Lowe M.D., an orthopedic surgeon. (A89-90.) Dr. Lowe's medical records revealed similar findings of restrictions in the range of motion of Ms. Mahmood's cervical spine. In his review of the MRI film of November 27, 2007, Dr. Lowe noted a central herniated cervical disc at the C5/C6 level and suggested that surgery would be considered if all non-surgical attempts failed to provide relief. Likewise, Dr. Skolnick reviewed the reports of Frederic McEliece, M.D., whose report of November 18, 2008, suggested that Ms. Mahmood would be a surgical candidate for both her cervical and lumbar injuries. (A90.) Dr. Skolnick also relied on reports from David Weiss, M.D., which likewise supported his recommendation for a fusion. Dr. Weiss found paraverteval muscle spasm and tenderness when examining Ms. Mahmood's cervical spine, along with trapezius and splenius spasm. He also found a restrictive range of motion.

27

Finally, Dr. Skolnick reviewed and compared various MRI films and agreed that Ms. Mahmood was suffering from a herniated disc at the C5/C6 with aggravation. The histories contained in the various treating medical records indicate that Ms. Mahmood had conservative medical care which was unsuccessful. Thus, Dr. Skolnick's prescription for a cervical fusion was appropriate based on his own physical findings, a review of the medical records, his reading of the MRI films, and the opinions and diagnosis of various other physicians' opinions that he relied upon.

There is no dispute that Ms. Mahmood injured her cervical spine. Consequently, she underwent substantial medical treatment as directed by various physicians including Dr. Lowe, Dr. Ibrahim, and Dr. Sackstein. This included the conservative, non-surgical intervention originally suggested by Dr. Lowe, in the form of epidural and facet injections, as well as treatment through medicines.

Thereafter, Dr. Lowe opined on September 18, 2008, that he did not anticipate surgery unless all non-surgical attempts at treatment failed to provide relief. Moreover, as of June 24, 2009, Dr. Lowe cleared Ms. Mahmood for cervical injections under the supervision of Dr. Sackstein. As of February 12, 2012, Ms. Mahmood was treated with Dr. Ibrahim, who opined that she was suffering from chronic neck pain with radicular symptoms.

Dr. Skolnick examined Ms. Mahmood on May 3, 2010, and determined that those modalities were not successful. As physicians do everyday, the doctor made a diagnosis that was consistent with the facts in the case and made a recommendation for medical treatment to help with the same. The court below highlighted that Dr. Lowe did not opine that cervical surgery was needed. (A9-10.) This is simply not the basis to exclude another expert from testifying that it is. Would the defense have been precluded from offering their examining expert to testify that such a surgery was not necessary if Dr. Lowe had testified that it was? There is no justifiable reason why a qualified physician, like Dr. Skolnick, cannot testify that a cervical fusion is necessary under these circumstances. Certainly, and at the very least, a *Daubert* hearing should have been conducted regarding Dr. Skolnick's opinion that such surgery was necessary.

Consequently, there was no basis for excluding Ms. Mahmood's life care plan expert, Mona Yudkoff, R.N., from testifying regarding the costs associated with the cervical fusion surgery and TMJ injury in the future. (A12-14; A17a-2.) This preclusion of her testimony (which would have eliminated much of the damages set forth in her report) led to Plaintiff's counsel making a decision not to call her at all.

In sum, because the record was not fully developed such that the court had insufficient information on which it could make a *Daubert* ruling, the court below

was required to hold an *in limine* hearing.  For these reasons, this Court must reverse

the decision of the court below and grant a new trial on the issue of damages.

# POINT III.

## THE COURT BELOW ERRED BY DENYING PLAIN-TIFF'S MOTION FOR A NEW TRIAL. THE JURY-'S VERDICT WAS SHOCKINGLY DISPROPOR-TIONATE TO THE INJURIES. SUSTAINING THE AWARD WOULD BE MANIFESTLY UNJUST.

It is well settled that Federal Rule of Civil Procedure 59(a)(1) permits the court to grant a new trial on all or some of the issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). In the Third Circuit, the grant of a new trial is warranted "when the verdict is against the great weight of the evidence or errors at trial produce a result inconsistent with substantial justice." *Sandrow v. United States*, 832 F. Supp. 918, 918 (E.D.Pa.1993) (*citing Roebuck v. Drexel Univ.*, 852 F.2d 715, 735-36 (3d Cir. 1988)). "New trials because the verdict is against the weight of the evidence are proper when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993) (*citing EEOC v. Delaware Dep't of Health and Social Services*, 865 F.2d 1408, 1413 (3d Cir. 1989)). Where a challenge is made to the weight of the evidence, as opposed to the sufficiency of that evidence, a movant may ask the trial court to exercise its discretion and grant a new trial because the probative evidence in favor

31

of the movant as contrasted with that opposed to it is overwhelming. *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 365 (3d Cir.1999). When a motion for a new trial is based on a prejudicial error of law, the court has broad discretion to order a new trial. *Klein v. Hollings*, 992 F.2d 1285, 1289-90 (3d Cir. 1993). Even if there are no errors that would explain why the jury went wrong, however, the court should exercise its authority to grant a new trial where the verdict is shockingly disproportionate to the injuries.

The trial court errors relative to the exclusion of evidence relating to the force of impact and nature of the automobile collision as well as the exclusion of Dr. Skolnick's opinions relating to Ms. Mahmood's injuries have previously been addressed herein. Even if those errors are put aside, however, the jury damages award was so shockingly disproportionate to the injuries that a new trial must be granted.

The defendant stipulated to liability and made an offer of judgment in the amount of $250,000.00. The jury, however, awarded a total of only $25,000.00 for what are essentially catastrophic injuries in a 39 year old female. Thus, the defendants themselves perceived the value of the case to be ten times what the jury awarded. The evidence adduced at trial showed that Ms. Mahmood required extensive medical treatment following the accident with the tractor-trailer, including

32

an EMG, numerous MRIs of her shoulder, neck, and back as well as physical therapy, narcotic pain medications, and numerous risky injections. The evidence also showed that Ms. Mahmood suffered from PTSD, a mood disorder, and a cognitive disorder, all of which required therapy. Finally, the evidence showed that Ms. Mahmood suffered severe physical pain and suffering following the 2007 accident, that she was admitted to the emergency room on numerous occasions for severe pain, and that she was being treated by a pain management physician.

The defense's medical experts did not dispute that any of this treatment was necessary or unrelated to the accident. The only dispute was regarding the relationship and treatment of her surgical fusion in 2009. While the defense asserted that the injuries preexisted the accident giving rise to this litigation and that Ms. Mahmood only suffered soft tissue injury as a result of the 2007 accident, there were no objective tests to support this assertion. Indeed, all of the doctors admitted that an objective finding of lumbar radiculopathy was positive after the truck collision. There was no positive test or sign of lumbar radiculopathy before the defendant's truck collided with Plaintiff. Consistent with radiculopathy, the pain and tingling in Ms. Mahmood's legs got worse after the accident. Indeed, after reviewing the MRIs taken before and after the accident, Dr. Skolnick concluded that there was a change in the lumbar findings. Moreover, no doctor suggested that Ms. Mahmood

undergo lumbar surgery before the collision with the truck. After undergoing a discogram that was positive for a herniated disc, however, Ms. Mahmood underwent lumbar surgery after the 2007 accident.

In actuality, there was not even subjective information to support the defendant's assertion; rather, the evidence indicated that while Ms. Mahmood had some complaints in her neck and back following the February 22, 2002, accident in which Ms. Mahmood's car was rear-ended, her complaints ended sometime in early 2003 after she stopped receiving treatment. The complaints did not remanifest themselves until December of 2006 after Ms. Mahmood was involved in another car accident. Thus, from early 2003 until December 2006, Ms. Mahmood had no medical treatment or complaints to her back and neck. Notably, Ms. Mahmood missed only two days of work after which she returned to her waitressing position. Moreover, after the 2002 accident she received only conservative treatment, including physical therapy and chiropractic care.

On December 26, 2006, Ms. Mahmood was involved in a second rear end accident, again injuring her back and neck. Likewise, after this accident, Ms. Mahmood received only conservative treatment, including physical therapy and chiropractic care. After missing only ten days of work, Ms. Mahmood again returned to work as a waitress.

34

After the 2007 accident with the tractor-trailer, Ms. Mahmood was unable to return to her position as a waitress. Instead, she began hostessing, which required less physical exertion. Additionally, Ms. Mahmood sought treatment that she had never had following the 2002 or 2006 accidents. She began seeing a pain management doctor, Dr. Sackstein, who prescribed her aggressive narcotic pain medications for the first time, including Vicodin and Percocet. Additionally, she underwent multiple injections for the first time after being struck by the truck, including epidural injections, sacroiliac joint injections, and facet injections. She also underwent lumbar surgery after which she never returned to working as a waitress or a hostess. Due to the trauma surrounding the accident and the physical pain she had been enduring, Ms. Mahmood began treating for the first time with a psychologist, Dr. Amin, for PTSD, cognitive disorder, and mood disorder. Dr. Amin prescribed Ms. Mahmood anti-depressants.

Even if Ms. Mahmood's injuries were originally caused by a prior accident, all available evidence indicates that the injuries were seriously aggravated as a result of the 2007 accident; thus, under the aggravation principles of law the defense is responsible for all the damages that occurred after the accident giving rise to this litigation, including the extended course of treatment and the surgeries.

It is beyond question that the jury's damages award was shockingly disproportionate to the injuries that were proven. Therefore, this Court must reverse the decision of the court below and grant a new trial.

# POINT IV.

**THE COURT BELOW ERRED BY DENYING PLAIN-
TIFF'S MOTION FOR A NEW TRIAL. UNCONTR-
ADICTED EVIDENCE ESTABLISHED THAT THE
JURY IMPROPERLY CONSIDERED INFORMA-
TION REGARDING DEFENDANT'S OFFER OF
JUDGMENT. AS IT HAS NOT BEEN SHOWN
THAT THE JURY'S DELIBERATIONS OR VER-
DICT WERE ENTIRELY DEVOID OF THE PROBA-
BILITY OF INDUE INFLUENCE, THE VERDICT
MUST BE SET ASIDE.**

Subsequent to trial, defense counsel informed the court below that a juror

contacted their office, inquiring as to whether or not the "offer of judgment" was

higher or lower than the jury verdict. (A181.)  Plaintiff's counsel requested a

conference with the court below.  The court, however, declined Plaintiff's request

to investigate the issue any further.

It was unclear how the juror knew that an offer of judgment existed. The very

fact that the juror contacted defense counsel to inquire as to this information after

trial demonstrates the likelihood that this information influenced the jury's verdict.

The fact that the jury award was in the amount of the offer of judgement which a

zero left off, would certainly give rise to a suspicion that somehow one of the jurors

saw the offer but mis-read it. The circumstances surrounding this should certainly

have been investigated by the court.

It was fundamental error for the jury to reach a verdict after having gone outside the record to consider prejudicial information about the offer of judgment. Judicial control of jurors' knowledge of the case pursuant to the laws of evidence is fundamental to the prevention of bias and prejudice. *Farese v. United States of America*, 428 F.2d 178, 180 (5th Cir. 1970). Trial jurors have no right to investigate or acquire information relating to the case, outside of that information which is presented to them in the course of trial in accordance with established trial procedure. *Id.*, at 179. As stated by Mr. Justice Holmes, "The theory of our system is that the conclusions to be reached in a case will be adduced only by evidence and argument in open court, and not by any outside influence." *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907).

Impeachment of a verdict is warranted if prejudicial extraneous information is improperly brought to the jury's attention. *See Tannery v. United States*, 483 U.S. 107, 117, 107 S.Ct. 2739, 2745-46, 97 L.Ed. 2d 90 (1987); *McDonald v. Pless*, 238 U.S. 264, 268, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915); *Government of Virgin Islands v. Gereau*, 523 F.2d 140, 148, n.19 (3d Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed. 2d 323 (1976). This long-standing common law rule has also been codified in Federal Rule of Evidence 606(b), which provides:

> Upon an inquiry into the validity of a verdict . . . , a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any furor.

Fed. R. Evid. 606(b). *See U.S. v. Stansfield*, 101 F.3d 909, 914 (3d Cir. 1996).

Moreover, it consistently has been held that once it is shown that extraneous prejudicial information was brought to the jury's attention, the proper remedy for such a transgression is the grant of a new trial. *See In Re Beverly Hills Fire Litigation*, 695 F.2d 207 (6th Cir. 1983); *Farese v. United States*, 428 F.2d 178 (5th Cir. 1970); *Stiles v. Lawrie*, 211 F.2d 188 (6th Cir. 1954); *United States v. Brandenburg*, 155 F.2d 110 (3d Cir. 1946); *United States v. Michener*, 152 F.2d 880 (3d Cir. 1945); *United States v. Posner*, 644 F.Supp. 885 (S.D. Fla. 1986).

The Sixth Circuit Court of Appeals recognized that although a juror may not impeach his own verdict, such a rule does not preclude inquiry into any extraneous influences brought to hear upon the jury in order to snow what the influences were and whether they were prejudicial. *Beverly Hills Fire Litigation*, 695 F.2d at 213, (*citing Womble v. J.C. Penney*, 431 F.2d 985, 989 (6th Cir. 1970)). The Sixth Circuit Court opined:

> Rule 606(b) specifically allows inquiry into external influences upon
> a jury. This exception is necessary to assure that the parties receive a
> fair trial and that the integrity or the system itself is maintained.

*Id.* The jury's receipt or such extraneous information "requires that the verdict be set aside, unless entirely devoid of any proven influence or the probability of such influence upon the jury's deliberations or verdict." *Id.* at 215.

As the court below did not investigate the matter, it is unclear whether the juror who contacted defense counsel communicated her knowledge of the officer of judgement to the other members of the jury, thus polluting their deliberative process. It is unclear how the juror knew that an offer of judgment existed or if the juror understood the implications of their verdict with respect to the offer of judgement. Certainly the juror's knowledge of and use of the technical term, "offer of judge-ment," is unusual to say the least. Thus, it cannot be said that knowledge of this information by the juror is devoid of a polluting influence or the probability thereof upon the jury.

Whether the jury was impermissibly influenced was purely a matter of fact and not within the province of the court to determine, for "the law has no criterion by which to know or ascertain the effect which the improper evidence may produce upon the verdict." *Stiles,* 211 F.2d at 195. The trial judge herein nevertheless made a determination that the juror's misconduct did not effect the verdict, without

40

investigating the matter and even though the misconduct impacted squarely on the issue of the verdict. Notably, the material in question went to the heart of Plaintiff's case, specifically the issue of damages. As such, the only possible remedy for this most serious transgression from appropriate deliberative procedure is the grant of a new trial.

# **CONCLUSION**

For each of the reasons set forth above, this Court must reverse Judgment and

Orders of the court below and grant a new trial on the issue of damages.

Respectfully submitted,

/s/Randolph H. Wolf
Randolph H. Wolf, Esq.

/s/Katherine A. North
Katherine A. North, Esq.

214 Broad Street
P.O. Box 8938
Red Bank, NJ 07701
(732) 741-4448
*Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF BAR ADMISSION</u>

In accordance with 3rd Circuit LAR 46.1(e), Randolph Wolf, Esq. certifies

that he is a member of the bar of this Court, admitted August 1983.


By: /s/ Randolph Wolf_____
       Randolph Wolf, Esq.

## **CERTIFICATE OF COMPLIANCE**

In accordance with Rule 32(a)(7)(C) of the Federal Rules of Appellate

Procedure, I certify that within the Brief for Plaintiff-Appellant, there are 13,712

words as calculated by Microsoft Word 2010.


/s/Randolph H. Wolf
Randolph H. Wolf, Esq.

## VIRUS CHECK COMPLIANCE

This document has been scanned for viruses and is reported by Symantec Antivirus Corporate edition ® to be virus free as of the date it was scanned. All reasonable measures have been taken to protect all of *Wright Appellate Services, LLC* documents, but we cannot guarantee against viruses that have yet to be discovered. The PDF file is identical to the hard copy.


*Frederick W. Wright*
Frederick W. Wright
*Wright Appellate Services, LLC*
1015 Chestnut Street, Suite 517
Philadelphia, PA 19107
(215) 733-9870
Email address: appeals@wrightappellate.com

# AFFIDAVIT OF SERVICE

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

### 12-4207

### SANIA MAHMOOD,

*Plaintiff-Appellant,*

v.

### JOSEPH NARCISO;MAYFLOWER TRANS INC; ABC CORPORATION (1-100), said names being fictitious; VANTAGE BLUE; XYZ CORPORATION (1-100), said names being fictitious; JOHN DOES (1-100), said names being fictitious,

*Defendants-Appellees.*

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF PHILADELPHIA

I, Frederick W. Wright, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

I am retained by Katherine A. North, Esq., Attorney for Plaintiff-Appellant, that on this 2nd day of April 2013, I deposited two copies of the Brief and Appendix for Plaintiff-Appellant Volume I and Appendix for Plaintiff-Appellant Volumes II and III with the United States Post Office priority mail to the following:

Jeffrey A. Segal, Esq.
Weber Gallagher, et al
305 Fellowship Road, Suite 200
Mount Laurel, NJ 08054

Filing to the Court has been perfected on the same date as above.

/s/Frederick W. Wright
FREDERICK W. WRIGHT
Wright Appellate Services
1015 Chestnut Street, 517 Jefferson Building
Philadelphia, PA 19107
(215) 733-9870*(800) 507-9020*FAX (215) 733-9872
Email address: appealfww@aol.com